[No. 14267. Department One. January 7, 1918.]

WADE MORRIS et al., Respondents, v. HILLMAN INVESTMENT
COMPANY, Appellant.[1]

VENDOR AND PURCHASER—BONA FIDE PURCHASER—MISTAKE—ES-
TOPPEL—REFORMATION OF INSTRUMENTS. As against the bona fide
purchaser from the vendee, a vendor is not entitled to reformation
of a contract of sale which by mistake acknowledged receipt of $750
earnest money, the assignee of the contract having had no knowledge
of the mistake and having occupied the premises for several years,
paid taxes, and made improvements; since the vendor as the one of
two innocent parties suffering loss, was the one whose neglect was
responsible therefor.

Appeal from a judgment of the superior court for King
county, Ronald, J., entered February 10, 1917, in favor of
the plaintiffs, in an action for specific performance, tried to
the court. Affirmed.

Gay & Griffin, for appellant.

Turner & Hartge, for respondents.

WEBSTER, J.—On May 6, 1912, the appellant entered
into a contract in writing with J. D. McIntyre by which it
agreed to convey to McIntyre or his assigns certain real
property situate in appellant's Pacific City addition to Se-
attle, Washington. The contract, which was executed in
duplicate, recited a purchase price of $1,435.88, and ac-
knowledged the sum of $750 as earnest money paid thereon.
Provision was further made for monthly payments in the
sum of $15, with interest in accordance with the terms and
conditions of the contract, which contained the usual for-
feiture clauses in the event of default by the purchaser;
conditioned also that the contract was not transferable ex-
cept with the written consent of the vendor. A strict com-
pliance with the terms of the contract with reference to the
time and manner of making the monthly payments, as well

[1]Reported in 169 Pac. 837.

as the assignment of the interest of the vendee thereunder, was waived by the subsequent conduct of the vendor. Each party was provided with a copy of the contract. The appellant retained its copy, either in its possession or under its control, until the trial of the cause in the lower court.

On May 7, 1912, without the written consent of the vendor, J. D. McIntyre assigned, by an indorsement in writing on his copy of the contract, his interest therein to respondent Wade Morris, which copy of the contract with the assignment thereon was filed for record on June 3, 1912. The transaction whereby McIntyre transferred his interest in the property to respondent Wade Morris was had between McIntyre and E. I. Root, who is the father of respondent Mabel I. Morris, wife of the assignee of said contract; McIntyre being indebted to Root in a considerable sum, transferring his interest in the contract to Morris at the request of Root, who, as a consideration therefor, released his claim against McIntyre to the amount of McIntyre's equity in the property. About this time Root wrote respondents, who resided in Kansas, that he had a place for them upon which there was a small balance due, and that, if they would move to Washington, he would give them his interest in the property. In response to the invitation, the respondents moved upon the premises described in the contract on March 21, 1913, where they have since lived, improving and occupying the place as their home.

Early in the summer of 1913, respondents received and examined the copy of the contract, which had theretofore been filed for record with the assignment thereon from McIntyre to Wade Morris. Relying upon the terms of the contract, which showed on its face the payment of $750 of the purchase price of $1,435.88 for the land, they performed labor and placed valuable improvements thereon in excess of the sum of $400. In addition thereto, respondents paid on the contract to appellant in principal and interest the sum of $112, and taxes in the further sum of $102.10, while

McIntyre seems to have made one monthly payment of $15 soon after the contract was executed.

Having tendered to appellant all sums due in accordance with the terms of the contract, which tender was refused by appellant, the respondents paid the amount of the tender into the registry of the court and brought this action on October 3, 1916, for specific performance. The appellant answered, controverting the amount which the plaintiffs claimed due on the contract, and alleging affirmatively that, at the time of entering into the agreement, by the mutual mistake of McIntyre and the defendant, it was stated in the contract that $750 had been paid upon the purchase price of the property described therein, although, as a fact, no money had been paid on the purchase price of $1,435.88; and further, that the McIntyres and the plaintiffs were in default in the payments required by the contract. A reformation of the instrument and a forfeiture thereunder was prayed for. The reply raised the issues of laches and equitable estoppel. Upon these issues, the cause was tried and a decree rendered in favor of plaintiffs, adjudging specific performance of the contract and directing a conveyance of the premises to the plaintiffs. The defendant has appealed. There were no findings made by the trial court, but these facts, in addition to those hereinbefore stated, are supported by a preponderance of the evidence.

The contract upon which this action is based was made in lieu of a former one between appellant and one Pearson for the same premises, whose rights thereunder had been assigned to McIntyre. The purchase price of $1,435.88, named in the new contract, represented the balance due after deducting from the selling price stated in the old contract all payments made thereon by Pearson, aggregating the sum of $750. In drawing the new contract, the manager of appellant, who executed the instrument in its behalf, by mistake inserted therein a credit payment of $750 on the purchase price of $1,435.88, so that the contract on its face

showed a balance of $685.88, when it should have shown a balance of $1,435.88; however, both copies of the contract were alike in this respect. The appellant maintained in its office a sales ledger wherein was kept a separate account showing the selling price of the property and all payments made thereon by Pearson, as well as those made on the new contract to McIntyre. A comparison of its copy of the contract with the ledger account would have revealed the mistake.

It is urged by appellant that Root knew the true amount due on the Pearson contract, and that the $750 payment acknowledged by the McIntyre contract had never been made, but the record does not support this contention; on the contrary, it fairly shows that his relations with the transaction between the appellant and McIntyre were not such as to advise him of the status of the accounts between them, and that, in communicating to respondents the amount of the purchase price, he relied upon the written contract in good faith and without any knowledge of the mistake which had been made by the appellant. After respondents moved upon the premises and received from Mr. Root the copy of the contract, relying upon the amount due on the purchase price as shown by the contract, they made improvements to the house, rebuilt the fences, set out an orchard of 100 trees, and otherwise expended in labor and materials thereon the undisputed sum of $429.49, also paying on the contract the additional sum of $112, and in taxes the further amount of $102.10. This they would not have done if they had been aware of the mistake in the contract, or had known that the $750 payment on the purchase price therein stated had in fact not been made.

On January 27, 1914, respondent Mabel I. Morris called at the office of appellant and paid to its manager, Mr. E. S. Bateman, the sum of $10, which was credited upon respondents' copy of the contract by appellant. Other payments were thereafter made by respondents to appellant which were

received and retained by it with full knowledge that respondents were in possession of the premises cultivating and improving the same as the assignee of the McIntyre contract. Early in the fall of 1914, respondent Wade Morris called at appellant's office to inquire about the status of the account. When he was informed by appellant's bookkeeper of the balance of the account as shown by the sales ledger, which did not show the $750 payment at the time the contract was made, Morris stated to the bookkeeper that he had a contract that was issued to McIntyre and assigned to him which on its face showed a payment of $750 earnest money, whereupon he was advised by the bookkeeper to bring the contract in some time and let him see it. This Morris did in August, 1916, after having received a letter from appellant stating the balance due on the contract was in the principal sum of $1,383.88, and interest in the additional sum of $290.12. Upon the exhibition of his contract to the bookkeeper at this time, a credit of $750 was entered by appellant on its ledger account as of the date of the contract. The original ledger sheet, which is before us as an exhibit in the case, shows this credit payment as "earnest money." Appellant's manager, subsequent to the making of the entry by the bookkeeper, inserted in red ink the word "error." Miscellaneous memoranda pertaining to this ledger account, which was opened in the name of J. D. McIntyre, shows clearly a knowledge on appellant's part, during the years 1914, 1915, and 1916, of the possession of these premises by respondents under the McIntyre agreement. Among them are: "McIntyre trans to Morris (recorded). Lives on the place with his wife." "1-12-15 Mrs. Wade Morris writes will payment this month. J. W. F." "1-10-14 will pay soon." Appellant's printed notice, signed in its behalf by Mr. Bateman, its manager, which is also before us as an exhibit in the case, bears date August 18, 1914, and is styled: "Notice of forfeiture, if payment is not made." The notice is addressed to "J. D. McIntyre or Morris and Jane Doe

McIntyre, Jane Doe Morris." During the examination of
Mr. Bateman, the record shows the following:

"The Court: When Mrs. Morris came to you early in
1916 and asked you for an extension of the time, you did
not at that time refuse to recognize her rights, but you did
agree to grant an extension of time, and still, after con-
senting, I understand they didn't pay anything, is that cor-
rect? A. Yes, in a way; it is like this, we never make prom-
ises that we will carry them any definite length of time, but
we make promises that we will not take immediate action.
The Court: You made a promise that you would not take
immediate action, but didn't notify her you would not recog-
nize her? A. Yes."

This conversation was at least a year and a half after
Wade Morris had called the attention of appellant to the
fact that the contract which had been assigned to him by
McIntyre showed on its face the credit of the $750 payment
as earnest money, and several months before appellant mailed
Morris the statement of the account as shown by the ledger
sheet which resulted in Morris' visit to appellant with his
copy of the contract when the ledger credit was entered as
before stated. During all this time a comparison by appel-
lant of its copy of the contract with the ledger account
would have verified the statement of Morris, and resulted no
doubt in the discovery of the mistake by appellant, a circum-
stance to which it seems the appellant attached little impor-
tance until the tender was made by respondents. preliminary
to the commencement of the action for specific performance
in accordance with the terms of the contract.

The question presented is whether, upon the foregoing
facts, the appellant is entitled to a reformation of the con-
tract. Its right to a forfeiture as against respondents rests
in a reformation of the instrument, there being no contention
that the tender was not sufficient to satisfy the terms of the
written agreement.

The equitable remedy of reforming written instruments
where, by mutual mistake, the writing does not express the

true agreement of the parties, has been frequently sustained by the decisions of this court. The principle is no longer questioned; the inquiry is, Do the equities of the given case require its application?

In *Dennis v. Northern Pac. R. Co.*, 20 Wash. 320, 55 Pac. 210, we held that, where a contract for the sale of land provided for the reservation by the grantor of a right of way, but through a mistake in the deed made in pursuance of the contract the land was conveyed free of the reservation, the deed should be corrected in a court of equity on the ground of mutual mistake. The principle was there invoked against a purchaser from the vendee, who had knowledge of the mistake in the deed and of the possession of the right of way by the railway company at whose instance the deed was reformed.

In *Rosenbaum v. Evans*, 63 Wash. 506, 115 Pac. 1054, we held that, where the scrivener in preparing the instrument, by mistake entered a wrong description of the property, the deed should be reformed to include the property which the parties intended it should convey. In the course of the opinion, it was said:

"It is urged that, in the absence of fraud, one who signs a written instrument, without reading it or acquainting himself with its contents, is estopped by his own negligence from maintaining a suit for its reformation. The respondents both testified that they did not read the deed before signing. We do not think the authorities cited by appellants to sustain this contention are applicable to the facts before us. They, no doubt, announce the correct rule as applied to certain kinds of contracts. We cannot think that the mere failure of either party to a deed to read it operates as a bar to an action for its reformation, based upon error in the description. Mistakes in the description of real property, where it is described by government subdivisions, are easily made. The respondents in good faith believed that they furnished the scrivener with the correct description, and relied upon him to write it in the deed. The rule contended for would be harsh and inequitable if applied here. The rules

governing cases of equitable cognizance must be applied with more or less flexibility as the equities of the particular case warrant."

In *Young v. Jones*, 72 Wash. 277, 130 Pac. 90, we held that, where the evidence was clear and convincing, equity would reform a deed to show the intention of the parties, where the instrument, by mutual mistake, provided that the first party, instead of the second party, should assume the payment of a mortgage on the premises conveyed. In the opinion of the court it was said:

"In such a case a court of equity will, *in the absence of countervailing equities*, grant a reformation. . . . The doctrine of laches as a defense is grounded on the principle of equitable estoppel, which will not permit the late assertion of a right *where other persons by reason of the delay will be injured by its assertion*. The case before us presents no such aspect. No right of a third party is involved. The respondents Lofgren had notice of the appellants' claim almost as soon as the mistake was discovered. There is no evidence that the respondents or any one else will be placed in any worse position by a reformation because of the delay. No adverse equities have arisen in the interim. The fact of appellants' claim was at all times known to those claiming adversely. There was no evidence of fraud, deceit, or bad faith on the appellants' part. In such a case, mere delay, short of the period fixed by the statute of limitations, will not bar the action. The question is dependent upon the inherent equities of the particular case."    (Italics are ours.)

And in *Carlson v. Druse*, 79 Wash. 542, 140 Pac. 570, a deed which, by a mutual mistake of the parties, failed to convey the premises intended was reformed to conform to their previous agreement. It was there said:

"It is argued that the delay in the commencement of this action—about two years—should bar a recovery, or at least should create an inference against the respondent's version of the transaction. The respondent testified that he told the appellant in July, 1910, that the description in the deed was not correct; that it did not give him as much land as he was entitled to have. The delay has not resulted to the preju-

dice of the appellants. They have had the possession and proceeds of the land since they reset the stake. The tract was planted to bearing fruit trees at the time of the purchase. There being no intervening rights, the delay is not material."

In all of these cases, except the *Dennis* case, the reformation was had against the other party to the instrument which, by mutual mistake, failed to express the true agreement of the parties; while in the *Dennis* case, the court found that the purchaser of the grantee had notice and knowledge of the mistake in the deed to his grantor, as well as of the possession of the right of way by the former grantor who sought the reformation. In all of them, except the *Young* case, the mutual mistake was in the description of the premises, either too little or too much having been conveyed by the terms of the instrument; while in the *Young* case, the deed named the wrong party who was to assume the mortgage on one of the tracts of land exchanged by the parties.

The principle applied in those cases is fully recognized as being supported by the weight of modern authority, but the very reasons given for the enforcement of the rule precludes its present application. As was said by Judge Ellis in *Young v. Jones, supra,* "The question is dependent upon the inherent equities of the particular case." Here the facts and circumstances surrounding the transaction, the subsequent conduct and relationship of the parties with reference to the subject-matter from which the relief is sought, as well as the manifest hardships that would follow the application of the principle, all prevent, rather than require, invoking the doctrine in appellant's behalf. In fact the equities of the case are with respondents; the inequities with appellant.

The respondents were in no wise connected with the original transaction, neither had they any knowledge, nor means of obtaining any knowledge, of the mistake which had been made by the appellant. It was its mistake—the result of its own carelessness and inexcusable neglect—a mistake which bore no element of mutuality between appellant and respond-

ents.  McIntyre's interest in the premises was acquired by virtue of a trade of other properties with Pearson, and it was the appellant who prepared and executed the new contract to McIntyre in lieu of a transfer of the old contract from Pearson.  Appellant's ledger showed the status of the Pearson account, and the only mistake made in the new contract was in the balance due on the purchase price, which was calculated and placed in the instrument by the appellant. Moreover, after the respondents were informed of the contract which had been assigned to them, and of approximately the amount they would have to pay to acquire the premises, they left their home in Kansas and moved upon the land described in the contract, which they improved and developed, relying upon the terms of the contract regarding the balance due on the purchase price.  With full knowledge of respondents' possession and reliance upon the contract, the appellant made no effort to discover or rectify the mistake which it had made, but continued to accept and receive payments from the respondents which it indorsed upon the contract exhibited by respondents; nor did it seek a reformation of the instrument until more than two years after respondent had called its attention to the variance between his contract and the ledger account of the appellant.  In fact, the reformation was never sought until after tender made and suit begun by respondents for specific performance of the written agreement.  This notwithstanding the self-evident fact that the appellant, by exercising the degree of care and diligence which the ordinary individual exercises in matters of like importance, would have discovered and appreciated the mistake of which it now complains, long prior to the time when the status of the account was called to its attention by the respondents.  The reformation of this contract to meet the intention of the appellant would work a hardship upon the respondents.  It would, in fact, inflict an injury upon innocent parties as the result of an act of which they had no knowledge and for which they were in nowise responsible, and

this at the instance of one who would thus lately invoke equity as a relief from its own careless and negligent act.  Our views in this respect find support in the following authorities:  *Brown v. Baruch*, 24 Wash. 572, 64 Pac. 789; *Carruthers v. Whitney*, 56 Wash. 327, 105 Pac. 831, 134 Am. St. 1114; *Windsor v. Sarsfield*, 66 Wash. 576, 119 Pac. 1112; *Rowe v. James*, 71 Wash. 267, 128 Pac. 539; *Maxwell v. Dimond*, 83 Wash. 30, 145 Pac. 77; *Crodle v. Dodge*, ante p. 121, 168 Pac. 986; *Grimes v. Sanders*, 93 U. S. 55-63; *Gailey v. New Castle Elastic Pulp Plaster Co.*, 34 Pa. Sup. Ct. 533; *Johnston v. Standard Min. Co.*, 148 U. S. 360; *Duff & Oney v. Rose*, 149 Ky. 482, 149 S. W. 884; *Hopson's Executor v. Commonwealth for use of Shipp, etc.*, 70 Ky. 644; *Columbia Malting Co. v. Glenmore Distilleries Co.*, 150 Ky. 229, 150 S. W. 53; *Susquehanna Mut. Fire Ins. Co. v. Swank*, 102 Pa. St. 17; *Ater v. Smith* [245 Ill. 57, 91 N. E. 776], 19 Ann. Cas. 110, note; Kerr, Fraud and Mistake (4th ed.), pp. 339, 340; 10 Ruling Case Law, pp. 395, 396; 34 Cyc. 966; 3 Elliott, Contracts, § 2379.

In *Duff & Oney v. Rose, supra*, it was said:

"It seems to be the well recognized rule that in order that a mistake may come within the cognizance of a court of equity it must be shown to be, first, material; second, mutual, or shared in by both parties to the transaction; third, unintentional, and fourth, free from negligence.  Moreover, the party complaining of a mistake must move promptly on its discovery, and if he ratify the mistake or knowingly accept benefits therefrom, after its discovery, he will not be entitled to a correction."

In *Columbia Malting Co. v. Glenmore Distilleries Co., supra*, it was said:

"The man who wrote the contract must have known what was and what was not in it.  The party complaining of such a mistake must move promptly on its discovery.  The mistake must be mutual.  It must be free from negligence. . . .  'It is a peculiar province of courts of equity to correct or to relieve against mistake, but such relief will not

be granted to the party who caused the mistake, when to correct it would shift the loss upon another'."

In Elliott on Contracts, at § 2379, the author says:

"A court of equity may refuse reformation where it appears that the plaintiff has been guilty of laches in the premises, or where it appears that he was guilty of negligence in the transaction, especially if detrimental to the other party or innocent third persons."

In 34 Cyc., at page 966, this rule is stated:

"Laches consists in undue and unaccounted for delay, and what constitutes delay sufficient to bar a reformation must be determined by the facts of each case and the principles of equity. If, relying on the instrument containing the mistake, others have acted upon the worth of it, a very short delay may constitute laches."

In 10 Ruling Case Law, at page 396, this principle is announced, and a vast amount of authority cited in its support:

"Hence, it has been said, laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. When a court sees negligence on the one side and injury therefrom on the other it is a ground for denial of relief."

See *Crodle v. Dodge, supra.*

Upon the doctrine of equitable estoppel, this court, in *Rowe v. James, supra,* said:

"The basis of all estoppel *in pais* is that there is one innocent party and one negligent or wrongdoing party, and the doctrine means that, when the innocent party has been induced to surrender a valuable right or to change his posi-

tion to his prejudice relying upon the acts or representations of the negligent or wrongdoing party, then the latter will not be heard to assert the falsity of his acts or representations to the prejudice of the former."

See, also, *Carruthers v. Whitney,* and *Maxwell v. Dimond, supra.*

Moreover, it is elementary that, where one of two innocent parties must suffer, the one whose act or neglect is responsible for the situation should bear the burden. *King County v. Ferry,* 5 Wash. 536, 32 Pac. 538, 34 Am. St. 880, 19 L. R. A. 500; *Hunt v. Panhandle Lumber Co.,* 66 Wash. 645, 120 Pac. 538.

In *Lindsay Petroleum Co. v. Hurd,* Law Rep. 5 P. C. 221, 239, the thought underlying the doctrine of laches and equitable estoppel as applied to cases of the character of the one here under consideration is stated in this language:

"The doctrine of laches in courts of equity is not an arbitrary or technical doctrine. Where it would be *practically unjust* to give a remedy, either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where by his conduct and neglect he has, though perhaps not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterwards to be asserted, in either of these cases, lapse of time and delay are most material. But in every case, if an argument against relief, which otherwise would be just, is founded upon mere delay, that delay of course not amounting to a bar by any statute of limitations, the validity of that defense must be tried upon principles substantially equitable. Two circumstances always important in such cases, are, the length of the delay and the nature of the acts done during the interval, which might affect either party and cause a balance of justice or injustice in taking the one course or the other, so far as relates to the remedy."

In *Erlanger v. New Sombrero Phosphate Co.,* L. R. 3 App. Cas. 1218, 1279, after quoting the above statement, Lord Blackburn said:

"I have looked in vain for any authority which gives a more distinct and definite rule than this; and I think, from the nature of the inquiry, it must always be a question of more or less, depending on the degree of diligence which might reasonably be required, and the degree of change which has occurred, whether the balance of justice or injustice is in favor of granting the remedy or withholding it."

After carefully weighing the equities in this case, we are convinced the balance of justice is in favor of withholding the remedy of reformation.

The judgment is affirmed.

ELLIS, C. J., PARKER, MAIN, and FULLERTON, JJ., concur.