[No. 29554. *En Banc.* November 19, 1945.]

J. L. PETERSON *et al., Appellants,* v. W. B. PAULSON *et al., Respondents.*[1]

[1]Reported in 163 P. (2d) 830.

*Horrigan & Horrigan* and *Ivan Merrick,* for appellants.

*Moulton & Powell,* for respondents.

STEINERT, J.—This action grew out of a controversy concerning the rightful ownership of approximately two acres of land. In their complaint, plaintiffs sought to have their alleged title to the land quieted against the asserted claim of the defendants. By cross-complaint, the defendants sought to have the title to the same land quieted in themselves against the claim put forward by the plaintiffs. Upon a trial without a jury, the court entered a decree in favor of the defendants, granting them the relief asked for in their cross-complaint. The plaintiffs appealed.

The land which is here in controversy and certain other lands adjacent thereto are located in section 29, township 9 north, range 29 east, W. M., in Benton county, Washington. The Columbia river, in its general southerly course in that region, enters the northwest quarter of the northwest quarter of section 29 at a point on the west line thereof and flows in a southeasterly direction across the section, making its exit therefrom at a point on the east line thereof, near the northeast corner of what normally would be described as the northeast quarter of the southeast quarter of the section. This intercurrence of the Columbia river within the normal subdivisions of section 29 produces fractional subdivisions, known, designated, and numbered as "lots."

Lot 2, containing 34.75 acres, constitutes the major part of what normally would be described as the northeast quarter of the southeast quarter of the section and comprises that portion of the quarter-quarter section which lies south of

the river. According to a map introduced as an exhibit in the case, and hereinafter reproduced in part, the river becomes a part of the north boundary line of lot 2 at a point about four hundred fifty feet east of the northwest corner of the lot and then proceeds in a southeasterly direction across and beyond the east boundary line of the section. Immediately west of lot 2, and lying in the same latitude, is a full forty-acre subdivision described as the northwest quarter of the southeast quarter of section 29. Through the southerly portions of these two legal subdivisions runs the Columbia irrigation district canal, extending in an easterly-westerly direction.

Immediately north of the entire north line of the northwest quarter of the southeast quarter and also north of the westerly four hundred fifty feet, approximately, of the north line of lot 2, in section 29, lies lot 3. This lot has a triangular shape and comprises in all 14.1 acres. It is bounded on the west by the full length of the west line of what normally would be the southwest quarter of the northeast quarter of the section; on the south by the north line of the northwest quarter of the southeast quarter and by the westerly four hundred fifty feet of the north line of lot 2; and on the north and east by the Columbia river. That portion of lot 3 which lies above, or north of, the westerly four hundred fifty feet of lot 2 and which extends northwardly to the river, comprises about two acres, and is, of course, also triangular in shape. It is this two-acre triangle, hereinafter at times, for convenience, referred to as tract X, which is the immediate subject of this litigation. The exact location of tract X may be better visualized if it is understood that it forms the easterly extremity of lot 3 and lies immediately north of the westerly four hundred fifty feet of lot 2. It may also be noted that this triangular tract X, which is a part of lot 3, lies wholly within the *southeast* quarter of the northeast quarter of section 29, while the remainder of lot 3 lies within the *southwest* quarter of the northeast quarter of that section. Traversing lot 3, including tract X, is a highway which extends generally east and west and runs between Kennewick and Richland.

In order to afford a clearer understanding of the situation encompassed in these various descriptions just given, we shall at this point present the following replica of the map, or plat, which was used upon the trial and upon which the respective negotiations hereinafter referred to concededly were based.

It may be explained that the original map in its entirety showed the whole of section 29, whereas the foregoing replica shows only those portions of the section which normally would be described as the southeast quarter of the northeast quarter, the southwest quarter of the northeast quarter, the northeast quarter of the southeast quarter, and the northwest quarter of the southeast quarter, or, in other words, the south half of the northeast quarter and the north

half of the southeast quarter of section 29. The map as originally introduced in evidence as an exhibit is the only map appearing in the record, and it was expressly agreed by both parties at the trial that there was no dispute regarding the map and that it was "all right."

The upper diagonal line shown on the map as here reproduced indicates the bank of the Columbia river as it flows from northwest to southeast through that particular area. The three parallel lines next below the diagonal line represent the public highway extending between Kennewick and Richland. The three parallel lines near the bottom of the map represent the irrigation district canal. The heavily shaded triangle, so marked during the trial and referred to herein as "tract X," comprises the two acres here in litigation. The featheredged rectangle below tract X represents that portion of lot 2 which was included in respondents' contract and in their original deed, as hereinafter more particularly explained.

Prior to, and in the early part of, April, 1935, the Columbia Irrigation District owned the various subdivisions of land particularly described above. It appears that all of these tracts once constituted a farm which one Roy Draper had formerly purchased from the irrigation district but which, on account of his failure to make the contract payments, had been taken back by the district and had become what is termed "district land."

On April 9, 1935, the Columbia Irrigation District, being then the owner of the land, and the respondent W. B. Paulson, who will hereinafter be referred to as though he were the sole respondent, entered into a written contract wherein the district agreed to sell, and the respondent agreed to purchase, the

"West 14.75 acres of Lot 2, lying North of Canal, Section 29, Township 9 North, Range 29 East W. M.,"

for the sum of $102.68, of which $25.67 was paid in cash and the balance of which was to be paid in three annual installments of $25.67 each, beginning December 31, 1936. The evidence is to the effect, and the trial court in its memoran-

dum decision found, that at the time this contract was made the manager for the district thought, and represented to the respondent, that lot 2 extended northwardly all the way to the Columbia river; that respondent believed that such was the fact; and that the contract was signed under the belief and with the understanding on the part of both the respondent and the officers of the district that the contract included the two-acre triangular tract X. That understanding was founded upon a mistake, however, for, as explained above, tract X was not a part of lot 2, but rather of lot 3.

On July 2, 1935, the district and the appellant J. L. Peterson, who will hereinafter be referred to as though he were the sole appellant, entered into a similar written contract wherein the district agreed to sell, and the appellant agreed to purchase,

"Lot 3, and the Northwest Quarter (NW¼) of the Southeast Quarter (SE¼) North of Canal, Section 29, Township 9 North, Range 29 East W. M.,"

consisting of about forty-four acres altogether, for the sum of $480, of which $96 was paid at the time of the execution of the contract, and the balance of which was to be paid in annual installments of $100 on or before November 1, 1936, November 1, 1937, and November 1, 1938, respectively, and $84 on or before November 1, 1939. It will be kept in mind that the triangular, two-acre tract X, the subject of this dispute, was and is a part of lot 3, which appellant contracted to purchase from the district.

So far as the record discloses, neither of these two executory contracts was ever recorded. Both of them, however, contained the usual provisions for forfeiture.

Respondent, who at all times during the prescribed term of his contract with the district was of the belief that the triangular tract X was a part of that portion of lot 2 which he had contracted to purchase, went into possession of the 14.75 acres which actually were comprised in his contract, and also took possession of a part of tract X, which was erroneously thought to constitute a part of the 14.75 acres. He at once made use of that portion of tract X south of the

highway for pasture and also constructed a fence along the highway and along the west line of the tract.

Appellant testified that when he entered into his contract with the district for the purchase of lot 3 he was familiar with the boundary lines of the lot and that he was certain at the time of that purchase that tract X was a part of lot 3. This claimed knowledge on his part is to be considered in connection with his subsequent acts and conduct. Appellant has lived on lot 3, although not on tract X, since the winter of 1935.

Respondent testified that in the fall of 1936 he leveled the land in tract X by digging away a hill thereon, and that the reasonable value of the work performed in that effort was two hundred dollars. He further testified that while he was unloading his tools preparatory to the commencement of that work, appellant drove up along the highway near by and said to respondent: "Before you do any work on this piece of land [tract X], it goes better with mine, you sell it to me." After some further conversation between the two men, respondent named a price at which he would sell, but at no time on that occasion did appellant make any statement claiming, or indicating that he claimed, ownership of tract X as a part of lot 3.

According to respondent's further testimony, he himself sowed some oats on tract X in the spring of 1937; then in the fall of that year he "disced in" the oats; in the spring of 1938 he seeded the area to rye; and finally, in 1939, he burned the weeds and put fertilizer on the tract. Appellant did not deny that he had made the proposal to respondent as above attributed to him, nor did he dispute the fact that respondent had done the work and made the improvement on the land as testified by the latter; according to appellant's evidence, however, that work was done by the respondent in 1938, not in 1936 or 1937, and the reasonable value of leveling the land did not exceed fifty dollars.

It appears from appellant's testimony that when he saw, or learned, that respondent was using tract X and was doing work upon it, whether in 1936 or in 1938, he made complaint to the irrigation district, but was told by its secretary that

the manager had made a thorough examination of the tract and had found that it was a part of lot 2 and belonged to respondent. That, of course, was an erroneous conclusion on the part of the officers of the district, for, as already explained, tract X had always been a part of lot 3, not of lot 2. At no time during that entire period, however, did appellant make any complaint to the respondent, and it is clear from the record, as the trial judge found and stated, that prior to about July 1, 1938, respondent had no actual knowledge of appellant's contract rights with respect to tract X.

During all this period of time, both the respondent and the appellant continued to make their payments on their respective contracts with the irrigation district. On October 16, 1937, respondent, having made his final payment, received a deed to the west 14.75 acres of lot 2, as provided in his original contract. He was still of the belief at that time, however, that tract X was covered by his contract and deed. That deed was filed for record on November 29, 1937.

In the summer of 1938, respondent, while in an abstract office in Prosser, was shown an abstract covering the Roy Draper property, referred to above, which formerly included all the lands described in appellant's and respondent's contracts respectively. Respondent then learned for the first time that the triangular two-acre tract X was not a part of lot 2, but was included in lot 3. Shortly thereafter he called at the office of the irrigation district and demanded a corrective deed which would include the two-acre tract X. His testimony on that subject was as follows:

"I asked them for a correction deed. Mr. Mason [the manager] said it wasn't necessary. He said them lines all run north and south, and he said 'You know what you bought', and he said, 'We know what we sold you', but I still insisted on it, and they finally agreed that they would give it to me; that is, Mr. Mason did and Mr. Maupin [the secretary] was there also."

The matter was then taken up with the board of directors of the district, and respondent's request was ultimately granted. On September 3, 1938, the district through its proper officers executed and delivered to respondent a cor-

rective deed, similar in form to its deed to him October 16, 1937, but describing the property therein and thereby conveyed as the

"West 14.75 acres of Lot 2 lying north of canal and that portion of said Section lying between the aforesaid description and the Columbia river adjoining on the north, Section 29, Township 9 North, Range 29, East W. M."

That deed was filed for record on November 28, 1938.

There is no contention that the description contained in the corrective deed was insufficient to cover the two-acre tract involved in this litigation. At this point we note the fact, as declared by the trial court, that when respondent received the corrective deed, although he then had recently learned that tract X was a part of lot 3, he still had no actual knowledge of appellant's contract or of what it actually covered; nor could it be said that he had constructive knowledge of it, since it had never been recorded.

In the meantime, appellant likewise had been making regular annual payments on his contract with the district. He made his last payment on November 1, 1939, and on December 30th of that year received from the district a deed conveying to him the property described in his contract of July 2, 1935, covering lot 3 and the northwest quarter of the southeast quarter, north of the canal, in section 29, township 9 north, range 29 east, W. M. That deed was recorded February 3, 1940. During all this time appellant had been paying all the taxes accruing on the entire lot 3. It thus appears that at the time appellant received his deed from the district the situation was this: Pursuant to its prior negotiations with the respondent, the district had conveyed the two-acre tract to the respondent by the corrective deed executed on September 3, 1938, and then over a year later, on December 30, 1939, purported to convey the same tract, as a part of lot 3, to the appellant, under the terms of his contract.

Sometime in 1940, or possibly later, appellant obtained his abstract, which contained a map of the property. That map does not appear in the record before us, however, nor is it in any way identified therein. Examining the map,

appellant saw that the triangular two-acre tract appeared as a part of lot 3. Shortly thereafter, he met respondent on the street in Kennewick and informed him of the facts disclosed by his abstract. About that same time appellant called at the office of the irrigation district and renewed the complaint made by him several years before, claiming that tract X was a part of lot 3 and belonged to him. A few days later, it seems, appellant and respondent were called to the office of the irrigation district, where a conference respecting the matter here in dispute was held between and among the two parties and the officers and directors of the district. Appellant was asked at that time why he had not made complaint earlier, and his reply was that on the former occasion they all told him it was Paulson's place, so he thought nothing of it. In the discussion that followed, the board members admitted to Peterson that they were at fault in giving him a deed covering tract X after they had already conveyed that same tract to respondent. They further offered to reimburse appellant for what he had paid on the purchase price and for taxes on the disputed tract. Nothing seems to have come of that conference, however, and in December, 1943, appellant commenced this action against the respondent to quiet title to the property. What gives this litigation its present fervor is the fact that, recently, property in the vicinity of the land here involved has attained an inflated value by reason of the construction work contemplated by the so-called Hanford Engineer Works.

In a carefully prepared memorandum decision, the trial court analyzed the evidence, found the facts, and drew its legal conclusions, expressed as follows:

"The district sold Paulson lot 2 plus tract X by their executory contract although by mistake it was not correctly described. As between the District and Paulson the reformation of the agreement evidenced by the corrective deed is effective. At all times since the making of the executory contract, Paulson had an equitable right to have the contract reformed, hence he had an equitable right in tract X by virtue of that contract.

"An executory contract creates only an equity. Posses-

sion by Paulson and exercise of acts of ownership actually known to Peterson in 1938, and the statement of the district's clerk, gave notice to Peterson of Paulson's claim while the instalments of 1938 and 1939 were unpaid by Peterson. The correction deed gave him notice on November 28, 1938, when the instalment of 1939 was unpaid by Peterson. Peterson acquired no title prior to deed to Paulson. The District had no interest in the tract when it deeded to Peterson. As between equal equitable claims, the first in time will prevail and Paulson held the prior equity.

"It follows that the complaint of Peterson to quiet title must be denied and the demand of the cross complaint granted."

In his brief, presented to this court, appellant assigns a number of errors, the first being that the trial court erred in holding that a mutual mistake had been made by and between the respondent and the district, in that they both supposed that respondent's contract of April 9, 1935, covered the two-acre tract here in dispute, and in holding that the contracting parties had intended that the contract should cover the two-acre tract.

■ Appellant correctly states the rule of law that, in order to justify the granting of relief on the ground of mistake, the parties to the transaction must have been mutually mistaken, since a mistake on the part of one party alone is not relievable, and, further, that the evidence of such mutual mistake must be clear, cogent, and convincing. *Strutzel v. Richardson*, 136 Wash. 485, 240 Pac. 682; *Blass v. Waldrip*, 176 Wash. 324, 29 P. (2d) 403; *Friend v. Continental Coal Co.*, 186 Wash. 102, 56 P. (2d) 1000; *John Hancock Mut. Life Ins. Co. v. Agnew*, 1 Wn. (2d) 165, 95 P. (2d) 386; 19 Am. Jur. 77, 80, Equity, §§ 57, 61; 53 C. J. 941, 1030, Reformation of Instruments, §§ 59, 199.

It is settled law in this state, however, that where a mutual mistake in description has actually been made in an executory contract or in a deed, such contract or deed may be reformed to set forth correctly the mutual intention of the parties. *Chapman v. Milliken*, 136 Wash. 74, 239 Pac. 4; *Miles v. Craig*, 147 Wash. 530, 266 Pac. 182; *Moeller v. Schultz*, 11 Wn. (2d) 416, 119 P. (2d) 660.

■ The facts in this case, as hereinbefore recited, leave

no question in our minds, as they left none in the mind of the trial court, that the irrigation district intended to sell, and the respondent intended to purchase, the two-acre tract as a part of the description contained in his contract; that both parties thought that the contract as drawn covered that tract; and that the payments were made by the respondent, and accepted by the district, under the belief by both that such payments were for land including that tract. Clearly, under such circumstances, if the respondent had brought an action against the district to reform the contract and to convey according to the contract as reformed, he would have been entitled to prevail. The district recognized that right by giving the corrective deed without being compelled by suit so to do. In giving such deed it merely performed its duty and did what it was obligated to do under its actual agreement with the respondent.

Since, by executing the corrective deed, the district did what it was obligated to do, it thereby conveyed to respondent all the right, title, and interest which it had in the two-acre tract. Consequently, the deed which the district thereafter executed to the appellant conveyed nothing, so far as that particular tract was concerned. The district could not convey something that it did not own. Appellant makes no claim of fraud on the part of the respondent or of the irrigation district.

Under his second assignment of error, appellant contends that, even if a mutual mistake was made by and between the respondent and the irrigation district, such mistake would not operate to extinguish valid rights in the appellant under his executory contract to purchase, he having entered into the contract without notice of respondent's claim to the property, and having paid a portion of the purchase price thereof. Appellant's contention is based upon the claim that he was an innocent and bona fide purchaser for value.

Appellant and respondent were purchasers of real property under executory contracts. Although such contracts do not vest any title or interest, either legal or equitable, in the vendee until the contract is fully performed, they do create and vest in the vendee an enforcible right

against the land which is subject to the contract. *Vandin v. McCleary Timber Co.*, 157 Wash. 635, 289 Pac. 1016; *Culmback v. Stevens*, 158 Wash. 675, 291 Pac. 705; *Cady v. Kerr*, 11 Wn. (2d) 1, 118 P. (2d) 182, 137 A. L. R. 713; *In re Horse Heaven Irr. Dist.*, 11 Wn. (2d) 218, 118 P. (2d) 972; *Lawson v. Helmich*, 20 Wn. (2d) 167, 146 P. (2d) 537, 151 A. L. R. 930.

 It is to be remembered, however, that neither the appellant nor the respondent recorded his contract, and hence neither of those contracts gave constructive notice of its existence or effect.

We have already shown and hereinabove have held that respondent had the right to have his contract reformed as against the district, and that such reformation did, in effect, take place when the district executed the corrective deed to the respondent. Complete title to tract X thereby vested in the respondent over a year before appellant received his deed or completed his payments under his contract. We have also shown that, at about the time respondent entered into his contract with the irrigation district, he went into possession of, and used, a part of the land here in dispute; that in 1938, or possibly even in 1936, respondent went into posssession of the remainder of the land here in controversy, and made improvements thereon, all to the knowledge of the appellant; that the appellant about that same time negotiated with the respondent as though the latter were the owner, or entitled to become the owner, of the particular tract of land; that at no time while respondent was making his payments did appellant complain to, or assert his rights against, respondent; that appellant continued to make payments on his own contract, without complaint, while respondent was using and improving the land; that during all this time respondent, as well as the district, was under the belief that respondent's contract covered the two-acre tract; and that appellant, although he claims to have known the exact boundary lines of lot 3, took no steps to apprise respondent of the situation or to prevent his use of the land here in dispute, but permitted respondent to complete his contract under the belief that the land was his, or to become

his on full performance of his contract with the irrigation district.

■ As stated by the trial court, possession by Paulson and exercise of acts of ownership actually known to Peterson, and the statement made to Peterson by the clerk of the irrigation district to the effect that the two-acre tract was a part of lot 2, all taken together, gave Peterson notice of Paulson's claim at a time when some of the installments owing by Peterson were yet unpaid; and the corrective deed given to Paulson in November, 1938, gave Peterson further notice, before he had paid his last installment or had received his deed.

■ To constitute one a bona fide purchaser of property as against an outstanding equity, the purchaser must have paid the purchase price and have acquired the legal title without notice of such prior equity. In 27 R. C. L. 703, Vendor and Purchaser, § 468, the rule is stated succinctly as follows:

"To entitle a grantee to protection as a *bona fide* purchaser he must have paid the purchase money as well as have acquired the legal title without notice; notice before payment is effectual to deprive him of such protection, though he may at the time have acquired the legal title; and it is not sufficient that the purchaser may have secured the payment of the purchase money, or may have paid a part of it."

In *Paul v. McPherrin*, 48 Colo. 522, 111 Pac. 59, 21 Am. & Eng. Ann. Cas. 460, the court recognized the seemingly uniform rule that in order for a person to claim the protection accorded to an innocent purchaser without notice, he must hold both the equitable and the legal title within himself prior to the time of actual notice. In support of that statement, the court quoted from 23 Am. & Eng. Enc. of Law (2d ed.) 518, as follows:

"As a general rule, the purchaser is not entitled to protection if he receives notice before he acquires title by conveyance, even though before notice he has paid the entire purchase price. And the same principle applies *a fortiori* to a case where a part payment has been made before notice. As a consequence of the foregoing propositions, it has been

deduced as a general rule in the United States that, if the purchaser has not obtained the legal title before notice of the prior equity, even though by contract and payment without notice he has acquired an equitable title, he cannot, after notice, acquire the legal estate and thereby defeat or postpone the prior equity, unless his own equity is of superior merit; but in order to produce such a result, he must acquire not only the equitable, but the legal title, without notice."

In a note to that case as reported in 21 Am. & Eng. Ann. Cas. 460, the annotator says:

"The weight of the authority is to the effect that a purchaser of lands takes subject to the claim of the holder of a prior equity although he makes his contract and pays the purchase money in full before receiving notice of the prior equity, provided he receives such notice before his own equity is clothed with the legal title."

The general rule above quoted seems to have been definitely applied, although not expressly stated, in *Miles v. Craig*, 147 Wash. 530, 266 Pac. 182. That case, like the one here, arose in Benton county and involved a triangular piece of land, bounded on one side by the Columbia river. The plaintiff Miles purchased from the defendant Ida M. Craig a ten-acre tract of land which was a portion of the triangular government lot owned by the defendant and containing twenty-five acres. For the purpose of obtaining a proper description of the property to be conveyed, defendant through her agent caused a survey to be made and markings placed upon the ground. Plaintiff went into possession of the tract as described in his deed and made certain visible improvements upon it near the south boundary line. Thereafter, the defendant Clarke entered into an oral agreement with Mrs. Craig to purchase from her the remainder of the government lot, lying principally to the south of Miles' ten-acre tract. A little later, Miles and Clarke, laboring jointly, built a wire fence along the southerly boundary of the ten-acre tract. The following year, Clarke, having completed his payments for the land purchased by him, received a deed from Mrs. Craig. Clarke thereafter had his land surveyed, and it was then discovered

that the original survey under which the plaintiff had purchased the ten-acre tract was erroneous, and that his true south boundary line was twenty feet further north than as described in his deed. The plaintiff thereupon commenced an action seeking reformation of his deed so as to include the twenty-foot strip on the south, and to quiet his title thereto as against both defendants. In affirming a judgment in the plaintiff's favor, this court held, first with reference to Mrs. Craig, that the mistake of description in the deed was mutual between herself and the plaintiff, and that the plaintiff was therefore entitled to a reformation of his conveyance and the quieting of his title as against Mrs. Craig. The court then proceeded in its opinion, as follows:

"We next inquire as to Miles' right to reformation of his conveyance from Mrs. Craig and the quieting of his title to the twenty-foot strip as against *Clarke*. This is a question as to what extent Clarke was required to take notice of Miles' right to the twenty-foot strip as against Mrs. Craig. Miles was in visible possession of the twenty-foot strip. Clarke actually knew of such possession. Clarke knew that Miles claimed possession as owner up to the line on which they jointly constructed the fence, which was the line located upon the ground by the first survey. Clarke knew that Miles was claiming up to that line by virtue of his conveyance from Mrs. Craig. All of this was known to Clarke while he retained the larger portion, if not all, of the purchase price he was to pay to Mrs. Craig for the conveyance to him of the remainder of lot 1, and long before his purchase was consummated." (Italics ours.)

We may concede that the facts in the foregoing case were considerably stronger and more compelling than those in the case at bar, but, on the question of prior notice to an alleged innocent bona fide purchaser of property, the principle upon which the cited case was decided was the same as that upon which our present decision rests.

We conclude that, by reason of the facts here involved, appellant was not entitled to claim the protection of a bona fide purchaser without notice.

■ Appellant next contends that the respondent bought and paid for only 14.75 acres of land, whereas by the judg-

ment of the trial court he is being given two additional acres without any consideration being paid. The contention is without substantial merit, because, as already shown, it was the belief of both the district and the respondent that lot 2 extended to the river, thereby including tract X, and that the district was selling, and the respondent was purchasing, a tract of land consisting of 14.75 acres extending all the way to the river. The fact that the corrective deed actually conveyed a greater amount of acreage than was originally contemplated did not render the deed void, for the respondent thereby got that which in the first instance he particularly had bargained for and that for which he paid the agreed price.

Appellant's final contention is that the equities between him and the respondent with respect to tract X are not equal and that his equity is the stronger one. The facts which tend either to support or to refute this contention have already been stated in detail and need not be repeated here. The original equities of the appellant and the respondent were of the same nature. Each had a vested right, according to the terms of his actual contract with the irrigation district, to acquire the title to the specific tract of land here in quesion. Respondent, however, had the prior right in point of time. His right ripened into an equitable title to the land upon the full payment of the contract price; this occurred while appellant's equity still continued to be merely a right under his contract, not an equitable title to the property. Furthermore, respondent's equitable title ripened into a legal title through the receipt of the corrective deed; this, too, occurred while appellant's equity had progressed no further than as a mere right under his contract, but without any semblance of title. Under the facts of this case, we are of the view that respondent had the prior and stronger equity.

The judgment is affirmed.

ALL CONCUR.