[No. 36837.   Department Two.   February 25, 1965.]

L. THORSTEINSON et al., Plaintiffs, v. WALTER WATERS et al., Respondents, I. O. IWERSEN et al., Appellants.*

*Reported in 399 P. (2d) 510.

*Russell Millhouse*, for appellants.

*George Livesey, Jr.* (of *Livesey, Kingsbury & Livesey*), for respondents.

HAMILTON, J.—Appellants (hereinafter referred to as Iwersens) appeal from a judgment reforming deeds and quieting title to a disputed strip of land in respondents (hereinafter referred to as Waters). The judgment arises out of a cross claim prosecuted between Waters and Iwersens as codefendants in an action initiated by plaintiffs (hereinafter referred to as Thorsteinsons).

The disputed strip of property may be described as the South 152.7 feet of Government Lot 2, Section 9, Township 40 North, Range 3 West of W. M., lying West of the county road (Marine Drive), situated in Whatcom County, Washington.

A map, based upon exhibit No. 5, is herein provided, with the hope that it will assist in an understanding of the factual aspects of the case.

In 1932, Waters acquired title to all of Government Lot 2, which is situated at Point Roberts on the Gulf of Georgia. On January 27, 1937, Waters, by warranty deed, conveyed a portion of the westerly half of Lot 2 to a partnership composed of themselves and one Archie McMillan and wife. At that time there were only two structures in the general area involved, a dock on the shoreline, located immediately south of the line on the map designated as

"North line claimed by cannery," and a building designated on the map and in the testimony as a "web house." The web house was generally believed to be immediately south of the southern boundary of Lot 2, and to be located upon the northernmost portion of government owned property utilized as a lighthouse reserve.

The purpose of the Waters-McMillan partnership was to construct and operate a fish cannery. It was deemed essential to this operation, and intended by Waters, that the dock be included within the property conveyed to the partnership, thus establishing the northern boundary. Not knowing, but accepting the general belief that the southern boundary of Lot 2 lay in the vicinity immediately north of the web house, Waters enlisted the services of an unlicensed surveyor, one Duke Rockwell, since deceased, to

survey and prepare a description for the property to be conveyed. Either at this time or later someone drove an iron pipe into the ground immediately north of the web house, seemingly as a marker of the southern boundary of Lot 2. In any event, a description was prepared and incorporated into the deed from Waters to the partnership, reading as follows:

"Southwest portion of Lot 2, Section 9, Township 40 North, Range 3 West, approximately 4.52 acres. 441.8 feet N and S x [sic] High Tide Line Easterly to Point 20 feet West County Road. Situated in Whatcom County, Washington."

The partnership constructed a cannery and incidental buildings in the area just south and east of the dock, and on September 22, 1937, sold the cannery and its property to one Carl Rubenstein, conveying the property by warranty deed containing the following description:

"That portion of Government Lot Two (2), in Section Nine (9), Township Forty (40) North of Range Three (3) West of the Willamette Meridian, particularly bounded and described as follows: Beginning at the southwest corner of said Government Lot Two (2); running thence East along the south line of said Lot Two (2), 460 feet more or less to the west line of the County Road; thence north along the west line of said county road to a point 441.8 feet due north of the south line of said Lot Two (2); thence west parallel with the south line of said Lot Two (2) to the Government meander line; thence southerly along said Government meander line to the point of beginning, together with all buildings and improvements situated upon said tract."

Thereafter, in January, 1943, the property was sold at sheriff's sale, pursuant to a judicial order of sale entered in an action involving Rubenstein, Waters, McMillan and another as parties. It was conveyed by sheriff's deed to Astoria & Puget Sound Canning Company, which company, on September 23, 1943, sold and conveyed the property by warranty deed to Iwersens. Both the sheriff's deed and the deed to Iwersens utilized the description quoted above,

except that there was added to the deed to Iwersens the following language:

". . . together with all buildings and improvements thereon and appurtenances thereunto belonging, including one (1) boiler in place in cannery building and metal smokestack in place, but not including one (1) hand-packing table about 35 feet long, which last item is expressly reserved to grantor."

Iwersens entered upon the property and have since occupied and operated the cannery. They were not strangers to the Point Roberts area, having lived there for a number of years prior to 1943, and, until the events giving rise to this action, labored under the prevailing impression that the government owned the property lying south of a line immediately north of the web house. They, as had others before them, made use of the web house for storage purposes and placed a padlock thereon. In 1957 or 1958, they occasionally drew water for cannery purposes from the well and pumphouse situated just north of the true south boundary of Lot 2, which well had been dug in 1957, with government permission, by one Carl Julius on what he believed to be government land. Iwersens did not, prior to 1959, otherwise assert any dominion over the disputed strip and, for that matter, neither did Waters. The real property was carried on the county tax rolls as described, and personal property taxes were levied against the cannery. The records do not reveal whether any taxes were assessed against the web house prior to 1959.

In 1956, Waters sold a 50-foot strip of land immediately north of the cannery to Thorsteinsons. This was described in the conveyance as the North 50 feet of the South 491.8 feet of Government Lot 2, Section 9, Township 40 North, Range 3 West, W. M., lying West of the county road commonly known as Marine Drive. Desiring to plat and sell additional holdings in Lot 2, Waters engaged the services of a licensed surveyor. A survey was completed in 1958, which revealed the location of the true south boundary of Lot 2, and the resultant infirmities in Iwersens' chain of title and the Waters-Thorsteinsons' deed. The situation

was confirmed by a second survey in 1959, initiated by Iwersens. Iwersens thereafter commenced to fence the property north and south of the web house.

In 1961, Thorsteinsons instituted this action seeking to quiet title to the property they intended to purchase against any claims of Waters and Iwersens. Iwersens answered, claiming ownership of all property south of the north line of the cannery property. Waters answered claiming ownership of all property lying north of the south 441.8 feet of Lot 2, except that conveyed to Thorsteinsons. By stipulation of the parties, Thorsteinsons' title to the 50-foot strip north of the north line of the cannery property was quieted without prejudice to the remaining issues between Waters and Iwersens. Thereafter, Waters served and filed a cross claim against Iwersens, whereby they asserted mutual mistake, asked reformation of the outstanding deeds, and prayed that title in the south 152.7 feet of Lot 2 be quieted in them. Iwersens denied mutual mistake and asserted laches and title in the disputed strip by adverse possession. Upon the issues so framed, the action came to trial.

The trial court, in essence, found that, until the 1958-1959 surveys, Waters and all subsequent grantees, including Iwersens, conceived the north boundary of the cannery property to include the cannery buildings and dock and mistakenly believed the south boundary of Lot 2 lay immediately north of the web house, and that the property between such boundaries constituted the property intended to be conveyed by the various deeds. From these findings, the trial court concluded that reformation was an appropriate remedy, corrected all deeds in the chain of title accordingly, and quieted title to the disputed strip in Waters.

On appeal Iwersens challenge the trial court's findings and conclusions, asserting failure of proof, lack of mutuality of mistake, laches, and title by adverse possession.

■ As a general rule, where parties to a transaction have an identical intention as to the terms to be embodied in a proposed agreement or in the extent of property to be conveyed by a deed or other instrument, and the writing

executed by them is materially at variance with such intention, a court of equity will, upon appropriate application, reform the writing so that it will truly express the intention of the parties, provided innocent third parties will not be adversely affected thereby. *Akers v. Sinclair*, 37 Wn. (2d) 693, 702, 226 P. (2d) 225 (1950); *Peterson v. Paulson*, 24 Wn. (2d) 166, 177, 163 P. (2d) 830 (1945); *Maxwell v. Maxwell*, 12 Wn. (2d) 589, 593, 123 P. (2d) 335 (1942); *Moeller v. Schultz*, 11 Wn. (2d) 416, 421, 119 P. (2d) 660 (1941); Restatement, Contracts § 504; 5 Williston on Contracts (Rev. ed.) § 1547 (1937); 3 Corbin on Contracts § 614 (1960). In order to justify the granting of such relief, upon the ground of mistake, the mistake must have been mutual or common to the parties to the transaction, for a mistake on the part of one party alone is not relievable, and the evidence of such mutual mistake must be clear, cogent, and convincing. *Peterson v. Paulson, supra*, and cases cited.

Iwersens first contend that the evidence does not clearly and cogently establish that Waters intended to reserve any of the southwesterly portion of Lot 2, or that they, the Iwersens, knew that the purported southern boundary of the cannery property lay in the vicinity of the web house.

The basic inquiry arising under this contention is what property was actually intended to be conveyed by Waters and to be acquired by the immediate and subsequent grantees, including the Iwersens. In this respect it is virtually undisputed that (a) at all times prior to the 1958-1959 surveys it was a common and accepted belief that the web house marked the area of the southern boundary of Lot 2; (b) the cannery buildings and appurtenances were constructed and operated upon the property bounded by the dock on the north and the web house on the south, and such was generally accepted as representing the "cannery property"; (c) the property conveyed by the various deeds was described, by dimension, as being 441.8 feet in depth by 460 feet, more or less, in width, which in turn approximates, in square footage, the acreage figure as used in the initial description prepared by the unlicensed surveyor, Rockwell; (d) the property to the

south of the web house was, prior to the 1958-1959 surveys, used by fishermen and the general public for various purposes, under the belief that it belonged to the government; and (e) both Waters and Iwersens, at all pertinent times prior to the 1958-1959 surveys, accepted and acted upon the belief that cannery property lay to the north of the web house and the property to the south thereof belonged to the government.

We are satisfied that the evidence as a whole, considered against the backdrop of the foregoing, clearly and cogently supports the trial court's ultimate finding that the property intended to be conveyed, and acquired under the various deeds, was the 441.8-foot sector of the westerly portion of Lot 2 lying to the north of the web house.

Iwersens next contend that, because they are remote grantees, there is a lack of mutuality of mistake between themselves and Waters. In essence, they assert they and their predecessors in the chain of title, are bona fide purchasers for value and without notice of any claim or equity of others in the disputed strip.

We find no merit in this contention, as presented, for two reasons. First, Iwersens and the prior grantees had notice, from the description in their deeds, that the property which they were purchasing represented only 441.8 feet of the southwesterly portion of Lot 2; and, second, they had notice, by virtue of the prevailing and accepted belief relative to government ownership of the land lying south of the purported web house boundary line, that their ownership did not extend into the disputed strip. Under these circumstances they cannot equitably assert they were bona fide purchasers for value of 594.5 feet of the southwesterly portion of Lot 2. See *Elwood v. Stewart*, 5 Wash. 736, 32 Pac. 735, 1000 (1893); *Dennis v. Northern Pac. R. Co.*, 20 Wash. 320, 55 Pac. 210 (1898); *Kuhl v. Lightle*, 29 Wash. 137, 69 Pac. 630 (1902). The evidence establishes that, until 1958, all parties labored under a common and mistaken belief as to the location of the true south boundary of Lot 2. Iwersens did not place reliance upon or assert any other

boundary line than the one commonly accepted until the surveys of 1958-1959.

■ It is next asserted that Waters was guilty of laches, precluding reformation, because they did not, prior to the 1958 survey, ascertain the location of the true south boundary line. The defense of laches is grounded upon the principle of equitable estoppel, which will not permit the late assertion of a right where other persons, by reason of the delay, will be injured by the assertion. *Young v. Jones*, 72 Wash. 277, 130 Pac. 90 (1913). In *Morris v. Hillman Inv. Co.*, 99 Wash. 276, 287, 169 Pac. 837 (1918), the following exposition from 10 Ruling Case Law 396 is quoted with approval:

" 'Hence, it has been said, laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. When a court sees negligence on the one side and injury therefrom on the other it is a ground for denial of relief.' "

We have held, however, that the mere negligent failure of a party to know or discover a fact as to which both parties are mistaken, does not of itself preclude reformation. *Moeller v. Schultz, supra; Carlson v. Druse*, 79 Wash. 542, 140 Pac. 570 (1914).

In the instant case we find no significant disadvantage or injury to Iwersens arising from the delay in ascertainment of the true southern boundary of Lot 2. Iwersens bargained for and have since occupied the 441.8 feet of Lot 2 constituting the cannery property. Until the 1958-1959 surveys they were content to concur in the commonly accepted boundary line of the web house. Any cloud upon their title to the cannery property has been dissipated by the amended pleadings in this action. The trial court did not err in denying the claim of laches.

Iwersens next contend they acquired title to the disputed strip by adverse possession under either the 7-year statute (RCW 7.28.080) or the 10-year statute (RCW 4.16.020). The trial court· considered this claim and concluded that the evidence did not sustain it. We agree with the trial court.

Under the evidence, as we read it, Iwersens did not, prior to the 1958-1959 surveys, exercise any dominion over the disputed strip inconsistent with the accepted belief that such property belonged to the government. And, in any event, an entry on and possession of land under the mistaken belief that it is public land will not operate to disseize the true owner, for the reason that the element of hostility is absent. *Skansi v. Novak*, 84 Wash. 39, 146 Pac. 160 (1915); *McNaught-Collins Imp. Co. v. May*, 52 Wash. 632, 101 Pac. 237 (1909). Neither will the evidence support a factual finding that prior to 1959 Iwersens paid taxes upon any more than the 441.8 feet of Lot 2 commonly accepted as constituting the cannery property.

Finally, Iwersens contend they are entitled to reimbursement for improvements made upon the disputed strip subsequent to 1959. There is, however, nothing in the record to indicate that such a claim was brought to the attention of the trial court. Neither do we find any substantial evidence bearing upon the cost of such improvements. Such a claim, raised for the first time on appeal, comes too late.

The judgment is affirmed.

DONWORTH, WEAVER, and OTT, JJ., and BARNETT, J. Pro Tem., concur.