[No. 39554.   En Banc.   March 5, 1970.]

RUDOLPH KEIERLEBER et al., Respondents, v. DAVID A.
BOTTING et al., Appellants.*

*Yates & Yates* and *Leslie M. Yates,* for appellants.

*E. F. Dailey* and *Richard D. Harris,* for respondents.

FINLEY, J.—Law and justice go hand in hand and should
never really part company. In *Slater v. Murphy,* 55 Wn.2d
892, 339 P.2d 457, 351 P.2d 515 (1959-60), this court, in
deciding the case, noted "in this instance the law and jus-
tice may have parted company." Upon further considera-
tion, we now recognize that the rule of law as laid down by
the court in *Slater* can all too frequently lead to unjust
results and that it should be modified.

This appeal arises from an action commenced by the

*Reported in 466 P.2d 141.

plaintiffs (respondents), Rudolph Keierleber, Glen Clow, and Leo Knight and their respective wives, against the defendants (appellants), David Botting and his wife. The plaintiffs seek to reform a deed to correct a mutual mistake in the description of land made in a 1953 conveyance of realty by the defendants to the plaintiffs' predecessors in interest. Defendants deny that plaintiffs are entitled to reformation, and they cross-claimed seeking to quiet title and to recover possession of the land with damages for its detention.

In May, 1950, the Bottings, acting as a community, purchased some properties in the Auburn area, including the parcel in dispute, which is the fourth parcel described in the 1950 statutory warranty deed given the Bottings by the vendors. See diagram below:

| |-------- fourth parcel --------| |
|---|---|---|
| N | Lot D<br><br>Purchased by Ericksons | Lot C<br><br>Occupied by Ericksons<br><br><br>1 7/8 acres | Lot B<br><br>Occupied by Keierlebers<br><br><br>1 7/8 acres |

The controversy before us involves subsequent dispositions of this fourth parcel, which is divided into the east one-half

(lot B) and the west one-half (lot C). (The lot described as lot A in the trial court is of no consequence in this dispute.) Each one-half contained about 1⅞ acres.

Early in 1952, before the Bottings had conveyed any of the land they purchased in 1950, Delbert Erickson and his wife acquired a lot (lot D) which was located to the west of lot C. By mistake, the Ericksons settled on part of lot C. They began to clear the land, put a trailer on the property, lived in it, and started construction of a house. At this time, all the land in the area was undeveloped and wooded.

In September, 1952, after the Ericksons had moved onto lot C, defendant David Botting orally agreed to sell a tract of land in the fourth parcel to a Mr. Mitlyng. David Botting testified that he showed Mitlyng the west one-half of the subject parcel (lot C) and that the Ericksons were not residing thereon. Plaintiffs contend, however, that David Botting actually showed Mitlyng the east one-half of the fourth parcel (lot B), and that this is the section Mitlyng intended to buy and David Botting intended to sell. Mitlyng agreed to a $700 purchase price and made two install-ment payments of $25, one in September, 1952, and the other in April, 1953. The payments were evidenced by two receipts signed by David Botting.

Nothing further happened until January, 1958, when Mitlyng approached David Botting and inquired whether he still had an interest in the land. Although land values in the area had risen sharply, Botting agreed to honor the oral bargain made in 1952. Thereafter, Mitlyng showed the east one-half of the fourth parcel to Leo Knight. Knight testified that Mitlyng told him that the east one-half was the best property in the area, and he pointed out the corner stakes marking the boundaries. Knight was emphatic that the property he examined with Mitlyng was the east one-half and not the west one-half which he noted was occupied by the Ericksons. The plaintiffs, Knights and Clows, then agreed to purchase the property which Mitlyng showed Knight. They paid Mitlyng's equity off, and the Bottings executed a real estate contract with the Knights and Clows in January, 1958. The section of land described in the con-

tract was the west one-half and not the east one-half which the Knights and Clows had intended to purchase.

In February, 1959, the Knights and Clows conveyed the property which they had purchased to plaintiffs, Keierlebers. Before purchasing the property, Keierleber visited it with a real estate agent who pointed out the boundaries of the east one-half. Although the Keierlebers intended to buy the east one-half and the Knights and Clows intended to sell that parcel, the land description on the real estate contract and the statutory warranty deed contained the legal description of the west one-half rather than the east one-half. Keierleber testified that he had no interest in purchasing the west one-half occupied by the Ericksons.

The Keierlebers moved onto the east one-half in March, 1959, and began to improve the property. They put in a power line, dug a well, installed a septic tank and placed a fence and shrubs on the property. A road was also built on the property. At no time, until late in 1964, did the Bottings assert any ownership to the east one-half which was occupied by Keierleber and his predecessors in interest.

Sometime in December, 1964, defendants made a survey in connection with the running of a pipe line to one of the adjoining lots they owned. The survey indicated that the Ericksons were residing on the west one-half and the Keierlebers were in possession of the east one-half on which the defendants had continued to pay taxes under the assumption they had not conveyed it. Defendant David A. Botting then approached the Keierlebers and advised them that a mistake had been made. Botting offered to let the Keierlebers remain on the east one-half if they would pay $25 per month for the time they had been in possession of the property and an additional sum of $4,500 without delay. Botting also advised the Keierlebers that the price would be $7,500 if they delayed. Defendants' efforts to get the Keierlebers to pay for the east one-half failed, as did settlement negotiations with the Ericksons concerning the west one-half.

Subsequently, in June, 1965, the Ericksons brought an action against all parties having any claimed interest in the

west one-half of the fourth parcel to quiet title in them by adverse possession. The trial court ruled in favor of the Ericksons and title to the west one-half was quieted in them.

In October, 1965, the Keierlebers, Knights and Clows instituted the present action to reform the deed from defendants to the Knights and Clows, and the deed from the Knights and Clows to the Keierlebers. Specifically, plaintiffs sought to change the erroneous description in the deeds from the west one-half to the east one-half of the fourth parcel.

The trial court, after hearing all the testimony, determined that the evidence was clear, cogent and convincing that a mutual mistake had been made by the defendants, husband and wife, and the plaintiffs' predecessors more than 13 years before. Furthermore, the court determined that all parties, both husbands and wives, herein involved were mutually mistaken as to the subject matter of the conveyance, and decreed that the land description be reformed to show that the east one-half, rather than the west one-half, of the fourth parcel was the intended subject matter of the conveyance. The questions of whether title to the east one-half vested in the plaintiffs by adverse possession or by estoppel were not raised in the trial court.

■ We have often reiterated and today reaffirm the rule that in order to justify the granting of reformation upon the ground of mistake, the mistake must have been mutual or common to the parties to the transaction, for a mistake on the part of one party alone is not relievable. *Thorsteinson v. Waters,* 65 Wn.2d 739, 399 P.2d 510 (1965); *Peterson v. Paulson,* 24 Wn.2d 166, 163 P.2d 830 (1945); and cases cited therein. The evidence necessary to uphold the reformation of a deed or instrument on the ground of mutual mistake must be clear, cogent, and convincing. *Kincaid v. Baker,* 66 Wn.2d 550, 403 P.2d 888 (1965); *Thorsteinson v. Waters, supra; Liming v. Teel,* 46 Wn.2d 762, 284 P.2d 1110 (1955); *Akers v. Sinclair,* 37 Wn.2d 693, 226 P.2d 225 (1950), and cases cited therein. The party seeking reformation has the burden of proving the mutual mistake

and must show clearly that the parties to the transaction have an identical intention as to the terms to be embodied in the deed or instrument and that the deed or instrument is materially at variance with that identical intention. When this is proven, a writing may be reformed to truly express the original intention of the parties to the transaction. *See Thorsteinson v. Waters, supra.*

The main contention raised by defendants is that the evidence was not sufficient to prove that either David Botting or his wife had intentions other than those expressed in the written instruments. Those instruments conveyed the west one-half of the fourth parcel, they contend, and not the east one-half as maintained by plaintiffs.

As to the defendant husband, David Botting, we agree with the trial court that the evidence was clear, cogent, and convincing that he was mistaken as to the subject matter of the conveyance as were the plaintiffs and their predecessors. However, the real problem in this case is not this determination by the trial court. Mrs. Botting also signed the instruments conveying the west one-half of the fourth parcel rather than the east one-half. Since Mrs. Botting did not participate as actively in the negotiations as her husband and did not testify during the trial of this case, a finding of mutual mistake on her part raises different problems.

These problems arise because of Washington's community property law. The rules of law which have evolved from the short statutory framework set forth in RCW 26.16 are a fearful and wonderful thing. It is perhaps inevitable that strains develop when rules of law designed to protect the wife from the dastardly 19th century profligate husband are applied in modern commercial practices. The law of community property is replete with judicially formed presumptions in an attempt to reduce these strains and develop a rational and just law of community property. Among a number of others, there are presumptions that participants in a meritricious relationship intend ownership to be where title is,[1] that property acquired during mar-

---

[1] *See, e.g., Walberg v. Mattson,* 38 Wn.2d 808, 232 P.2d 827 (1951); *Creasman v. Boyle,* 31 Wn.2d 345, 196 P.2d 835 (1948).

riage is community property,[2] and that an obligation incurred by the husband is a community obligation.[3]

The genesis of the problem of the instant case is in the community property rule that the husband cannot dispose of community real property unless the wife participates in the transaction. Again in an attempt to avoid the miscarriage of justice which could arise out of a mechanical application of that rule, this court has recognized exceptions when estoppel or ratification can be shown.[4] However, when reformation of contract problems arise in a community property setting, rules of law having little justification except a mechanical evaluation and application of precedent merit no judicial empathy. These rules of law can be traced to *Itkin v. Jeffery*, 126 Wash. 47, 216 P. 861 (1923), involving the disposition of community property by husband and wife and a subsequent reformation action arising therefrom. The mistake in *Itkin* was the omission of a single clause relating to the payment of taxes from the contract for the sale of the realty. Although there was considerable testimony to the effect that the husband, in negotiating the sale, had intended inclusion of the missing clause, the court held that as there was no testimony on the wife's intent, she was not a party to any mutual mistake. When limited to the factual situation of a refusal to add significant clauses to a contract without some expression of the wife's agreement, the *Itkin* decision may well be correct. However, it has not been so limited.

Thirty-six years later this court extended the *Itkin* decision in *Slater v. Murphy*, 55 Wn.2d 892, 339 P.2d 457, 351 P.2d 515 (1959-60). *Slater* was a five-four decision concerning the extent of the subject matter of the contract, *i.e.*, as to whether or not a certain triangular piece of land was included in a conveyance of a much larger farm tract.

---

[2]*See, eg., Scott v. Curie,* 7 Wn.2d 301, 109 P.2d 526 (1941); *Seaton v. Smith,* 186 Wash. 447, 58 P.2d 830 (1936).

[3]*See, e.g., Bryant v. Stetson & Post Mill Co.,* 13 Wash. 692, 43 P. 931 (1896); *Dizard & Getty v. Damson,* 63 Wn.2d 526, 387 P.2d 964 (1964).

[4]*See, e.g., In re Horse Heaven Irr. Dist.,* 19 Wn.2d 89, 141 P.2d 400 (1943); *Campbell v. Webber,* 29 Wn.2d 516, 188 P.2d 130 (1947).

██    The instant case concerns a mistake as to the whole of the subject matter. If anything, the injustice of the result reached in *Slater* would be magnified if we now accepted the arguments of appellants. Accordingly, we now hold that when one party seeks to reform a contract on the grounds that there was a mutual mistake as to the subject matter of the contract, there is a rebuttable presumption that the wife's intent is the same as the husband's. We believe that this rule is in accordance with the policy behind our laws of community property and reformation of contract and will tend to protect the just expectations of the parties to a contract. To the extent that *Slater v. Murphy, supra,* is inconsistent with this decision, it is overruled.

██    At an early date in the development of the common law, Sir John Powell remarked: "Let us consider the reason of the case. For nothing is law that is not reason." *Coggs v. Bernard,* 92 Eng. Rep. 107, 109 (K.B. 1703). We still find it useful, indeed imperative, to look to the reason and policy underlying a rule of law which is challenged. An awareness of these considerations lends credence to the modification of the rule in *Slater.* One of the premises underlying the community property laws of this state is that it is advantageous to have both parties to the marital community participate in the sale of real property. The wife's participation is thus, for a number of reasons, a conscious goal which should be furthered by the law. Yet the rule, as set forth in *Slater,* places a premium on the wife's lack of participation. The wily individual may be rewarded for keeping his (or her) spouse a silent nonparticipating party to the sale. He would then have the choice of two alternatives: the contract as intended and negotiated or as written and signed by the spouse. This declared policy, however, will be furthered by the adoption of a rebuttable presumption that the nonparticipating spouse's intent is the same as the spouse who does the negotiating. Being a rebuttable presumption, however, provides protection to the spouse who may be defrauded by the claimed "mutual mistake" of the other spouse and grantee.

Similarly, the policy behind our rule of contract reformation is that the *written expression of the negotiating parties' intent should govern* unless it is shown most clearly that the mutual intent was something else. When this heavy burden is met, there is no justification for thwarting the clear intent of the actively participating parties because of a failure to show the wife's intent. In short, we believe that our modification herein of the rule as to reformation is the best way to give effect to the justifiable expectations of all parties.

Some may say that stability of the law must be the primary goal of the courts. But, as to this, some significant doubts are prompted by Roscoe Pound's remarks almost 50 years ago:

> "Law must be stable and yet it cannot stand still. Hence all the writing about law has struggled to reconcile the conflicting demands of the need of stability and the need of change. The social interest in the general security has led men to seek some fixed basis for an absolute ordering of human action whereby a firm and stable social order might be assured. But continual changes in the circumstances of social life demand continual new adjustments to the pressure of other social interests as well as to new modes of endangering security. Thus the legal order must be flexible as well as stable. It must be overhauled continually and refitted continually to the changes in the social life which it is to govern. . . ."

R. Pound, Law Finding Through Experience and Reason 23 (1960).

Stability might assume primary importance were we convinced that there was widespread and justifiable reliance on an established but questionable rule of law. We are not unaware of the reliance which the bar must place in stability of legal rules when they plan commercial transactions. However, we do not believe that there is any justified reliance in maintaining ignorance of the wife's intent while frustrating the reasonable expectations of the negotiating parties to a contract. At best the previous rule was an unjustified trap for the unwary resulting in a fictitious disposition of the property.

720

The decision of the trial court is affirmed.

HUNTER, C. J., WEAVER, HAMILTON, HALE, NEILL, and McGOVERN, JJ., concur.

DONWORTH, J. Pro Tem., concurs in the result.