[No. 12412.   Department Two:   February 5, 1915.]

PETER SKANSI *et al.*, *Respondents*, v. JOHN NOVAK *et al.*,
*Appellants.*[1]

ADVERSE POSSESSION—CLAIM OF RIGHT—MISTAKEN BELIEF—EVI-
DENCE—SUFFICIENCY.  Under the rule that adverse possession must
be under a claim of right for the full statutory period of ten years
where there is no color of title even if possession was under a mis-
take, and that entry and possession under the mistaken belief that
it was public land is not hostile or adverse to the owner, the pur-
chaser of a lot in a dedicated plat does not, by adverse possession,
acquire title to a strip of adjoining tide lands, about fifty feet wide,
extending to the government meander line, which strip was not in-
cluded in the dedicated plat, a portion of which he occupied with a
boat shop and float for eighteen years, where his testimony was to
the effect that, at the time of his purchase, he supposed that he was
buying "to the water" or to the line of high tide, that his boat shop
was above that, and he supposed his ownership to high tide gave
him the right to the tide lands (which belong to the government),
that he had no knowledge of the meander line, no representations
were made, and he made no express claims of title; and when he
sold, he described the lot only, and moved off his boat shop and
float.

Appeal from a judgment of the superior court for Pierce
county, Card, J., entered May 13, 1914, upon findings in
favor of the plaintiffs, in an action to quiet title.  Reversed.

*J. W. A. Nichols*, for appellants.

*J. W. Selden* and *W. A. Johnson*, for respondents.

ELLIS, J.—This is an action to quiet title to a small tract
of land lying between lot 4, in block 2, of the town of Mill-
ville, in Pierce county, and the government meander line of
Puget Sound.   The plaintiffs claim title by adverse posses-
sion; the defendants, by mesne conveyances from the United
States.   There is little dispute as to the facts.   The only real
controversy arises from inferences which the contending par-
ties seek to draw from the facts.   Since we are forced to a
conclusion contrary to that reached by the trial court, we

[1]Reported in 146 Pac. 160.

shall state the evidence at a length which would otherwise be unnecessary.

The land covered by the present townsite of Millville passed by patent from the United States in 1869, long prior to the adoption of the state constitution. The patent therefor carried title to the government meander line, which included a strip of tide land of varying width along a large part of the water front of the present townsite.

In June, 1888, the defendants, who it is admitted then owned the upland and this bordering strip of tide land, by a plat legally executed and recorded, laid out upon the upland only, the town of Millville. This left, in front of the shore line proper of lot 4 in block 2, an unplatted strip of tide land, fifty feet wide, forty-seven feet along its northerly border and approximately seventy-six feet along its southerly border, which would have been included between the northerly and southerly lines of the lot, had they extended to the government meander line. This is the tract in controversy.

In July, 1888, the defendants Novak, who it is admitted had, in the meantime, acquired full title to lot 4 in block 2, conveyed that lot, by description according to the recorded plat and by direct reference thereto, to one Patrick.

Patrick's testimony, which is mainly relied upon as establishing plaintiffs' title by adverse possession, was, in substance, that he had no recollection that any one so represented, but he supposed, when he bought the lot, that "it ran from the street to the bay;" that he supposed he bought "to the water;" that he did not know where the meander line was and does not know where it is now; that he did not remember that anything was said to lead him to believe he was buying to the meander line, only, "I supposed I was buying to the water;" that the water was what he was after; that he wanted to put a boat shop there; that he cleared the lot, built a house on it and built a boat shop and a float on the tide lands below the bank—on the strip in dispute; that he

lived in the house and occupied and used the boat shop and float for about eighteen years; that Novak lived in the next block all of the time; that the defendants never said anything to the witness about getting off the tide lands. The nearest approach that Patrick made to any actual claim of ownership of the tide land strip is found in the following, which we quote from his testimony as set out in the abstract:

"Q. When you took possession of that did you claim to own that out to the water there, to the government line? A. I suppose I did, yes, sir. Q. All the time you were in possession of this property there, Mr. Patrick, you claimed to own it, did you? A. I did. Q. Did you speak to people around there about your ownership of that property? Did you ever say anything to anybody about it? A. I don't think so. I don't remember that I did. I sold the property to Mr. Curtis; he lives at Gig Harbor. He took possession of the property and lived there a year or two. Q. Do you know, Mr. Patrick, whether Mr. Curtis, when he took possession there, took possession of all the property down to the meander line that you sold to him? A. I suppose he did, yes, sir. I suppose he took possession of all the property I sold to him. Q. Now, when you sold to Mr. Curtis, what did you sell to him? A. Why, I sold that lot 4; the same property I bought from Novak. . . . Q. At the time you bought there, Mr. Patrick, was there any other line there excepting the government meander line that you knew anything about? A. I didn't know of any other line; I didn't know there was a meander line; I didn't know anything about the meander line; I supposed I bought to high water or bought out to the water. Q. At the time you bought, you didn't know about any line excepting the water line? A. No, sir. Q. Now, what do you mean there by the 'water line,' Mr. Patrick? A. Well, I meant where the high tide generally comes, or about there. Q. Where the high tide comes? A. Yes, sir. Q. Then, you refer to the water line there, and where you thought you were buying to, you mean the high tide line? A. Yes, sir; I thought I bought all above the water. Q. All above the water; that includes— you mean that includes within where you had your boat shop? A. No; my boat shop was outside of that altogether. Q. When you built there, Mr. Patrick, you built it there, claim-

ing that that was your property, did you? A. Why, I supposed that all in front of me was my own at that time. I didn't know—as to the tide lands I didn't know where they came to, or I didn't know where the meander line was. Q. During these eighteen years there was nothing occurred that made you change your mind, was there? A. No, sir. . . . I bought for the purpose of having a shop there and building boats. I supposed it was all mine. I would not have bought the lot unless I could have got the water. Q. When you were talking with Mr. Skansi about selling the property to him, did you say anything to him (Mr. Skansi) about how far he would own if he bought? A. No; I think not."

On cross-examination, he testified that the house he built to live in was on the bank, fifty or sixty feet above the shore line, and qualified his former answers as follows:

"Q. (by Mr. Nichols). Isn't it a fact that in buying that land to reach to the water, you bought down to the water and you thought all the tide lands belonged to the government and if you had a lot abutting on the water, anybody could build a float or wharf or anything else they wanted to, and that is the reason you thought you would have the use of the tide lands, isn't it? A. Yes; I supposed that if I owned the property above, I supposed I had the right to the tide lands, that is what I supposed. Q. What you were buying from John, was down to the water? A. Yes, sir."

On October 15, 1907, Patrick and wife sold and conveyed the lot to one Curtis and wife and by the following description:

"Lot four (4) of block two (2) town of Millville, according to the recorded plat thereof on file in the auditor's office of Pierce county, Washington."

At that time, Patrick removed his boat shop and float. Since then, the strip in controversy has not been used by any one except as a boat landing with a small impermanent float.

Curtis testified that he made the purchase through Magoon, Patrick's agent, and never talked with Patrick about

it. When asked what conversation he had with Magoon he answered:

"I asked him about the house; he said there was no under-pinning under it. I asked him how much land there was to it; he said there was supposed to be fifty by two hundred seventy, I think five, or something like that. I never meas-ured it or saw it measured. He said, 'Whatever the deed calls for is yours.'"

These figures are approximately the same as the measure-ments of the lot as shown upon the recorded plat. Magoon also told Curtis that, so far as he knew, the lot ran to the meander line.

On September 3, 1909, Curtis and wife sold and conveyed the lot to the plaintiff Peter Skansi by the same description as that contained in the deed from Patrick to Curtis. Curtis further testified that he never made any representation to Skansi as to how far the lot extended.

Peter Skansi testified that Curtis never lived on the lot but "rented it to a storekeeper;" that he, Skansi, bought the property through Magoon as the agent of Curtis; that he had no talk with Magoon except as to the price; that he thought he was buying lot 4, block 2 "down to the govern-ment meander line;" that he did not take possession but has continued to rent the property; that neither he nor the tenant ever used the tide land strip in controversy, "but I always took it as mine." He testified that Patrick's boat shop extended thirty or forty feet over the tide land and the float still further.

The foregoing is the full purport of the relevant testi-mony introduced on behalf of the plaintiffs. It is true that three or four other witnesses who had bought other lots from the defendants testified that the defendants repre-sented to them that their lots extended to the meander line. However potently probative such evidence might be as tend-ing to establish an estoppel, on the one hand, and an adverse holding on the other, were the suit between these witnesses

and the defendants, this evidence was palpably impertinent to any issue between the parties here. It was admitted that no such representations were made, either to the plaintiffs or to any one through whom the plaintiffs claim.

The defendant John Novak testified that he had never said anything to the plaintiffs about his ownership of the land in front of lot 4, until he had a survey made about three months before the commencement of this action; that he then advised the plaintiffs that the defendants owned the strip along the beach; that, when Patrick built his boat shop, the witness thought it was on Patrick's property; that the shop extended out onto the strip here in question only fifteen or eighteen feet.

The court made no formal findings but in his oral decision expressed the opinion that the plaintiffs had established title to the tide land in controversy by adverse possession. The decree went accordingly. The defendants appeal.

It is conceded that the title of the appellants is good unless the respondents' claim of adverse possession shall prevail. This is the sole question presented for determination.

The issue is further simplified by the fact that the respondents can claim no title by adverse possession under the seven-year statute with payment of taxes. Rem. & Bal. Code, §§ 786, 788 (P. C. 81 §§ 1373, 1377). There was no evidence whatever that the respondents or their grantors ever paid any taxes on the tide land strip here in question. Even if there were such evidence, it would be ineffectual to establish title, since it would lack the requisite support of a paper title. *Hesser v. Siepmann*, 35 Wash. 14, 76 Pac. 295; *Johnson v. Ingram*, 63 Wash. 554, 115 Pac. 1073; *Snell v. Stelling*, 83 Wash. 248, 145 Pac. 466.

The burden was upon the respondents to establish an adverse possession for more than ten years. Rem. & Bal. Code, § 156 (P. C. 81 § 53). Possession, to be adverse,

must be actual and uninterrupted, open and notorious, hostile and exclusive, and under a claim of right made in good faith. To constitute title it must have continued for the entire statutory period.

"To constitute an adverse possession there must be not only an ouster of the real owner, followed by an actual, notorious, and continuous possession on the part of the claimant, during the statutory period, but there must have existed an intention on his part, for a like period, to claim in hostility to the title of the real owner." *Port Townsend v. Lewis*, 34 Wash. 413, 75 Pac. 982.

See, also, *Scheller v. Pierce County*, 55 Wash. 298, 104 Pac. 277.

Color of title is not an essential to adverse possession under the ten-year statute, but a claim of right made in good faith is always an essential, where there is no color of title. Mere naked possession is not sufficient. *Blake v. Shriver*, 27 Wash. 593, 68 Pac. 330; *Hesser v. Siepmann*, 35 Wash. 14, 76 Pac. 295; *Wilcox v. Smith*, 38 Wash. 585, 80 Pac. 803; *Yesler Estate v. Holmes*, 39 Wash. 34, 80 Pac. 851; *Lohse v. Burch*, 42 Wash. 156, 84 Pac. 722; *Ramsey v. Wilson*, 52 Wash. 111, 100 Pac. 177.

While adverse possession may originate in a mistake it must be such a mistake as to lead to an unequivocal claim, either by acts or words, of a title or right to the land possessed. Mere possession up to the mistaken line without any claim of right or ownership beyond the true line is insufficient to constitute adverse possession or to work a disseizin of the true owner. *Wilcox v. Smith, supra; Milbank v. Rowland*, 63 Wash. 519, 115 Pac. 1053.

It is now the settled law of this state that an entry on and possession of land, under the mistaken belief that it is public land, will not have the effect of disseizing the true owner. Such possession is subservient to the public right; hence it is not hostile or adverse to the true owner. *Mc-Naught-Collins Imp. Co. v. May*, 52 Wash. 632, 101 Pac.

237; *Ramsey v. Wilson* and *Yesler Estate v. Holmes, supra; Delacey v. Commercial Trust Co.*, 51 Wash. 542, 99 Pac. 574, 130 Am. St. 1112; *State v. Sturtevant*, 76 Wash. 158, 135 Pac. 1035, 138 Pac. 650. The cases of *Johnson v. Conner*, 48 Wash. 431, 93 Pac. 914, and *Moore v. Brownfield*, 7 Wash. 23, 34 Pac. 199, in so far as they hold the contrary, were distinctly overruled by the *McNaught-Collins Improvement Co.* case and the *Sturtevant* case.

Measured by these principles, the evidence signally failed to establish the respondents' claim of title by adverse possession. It is clear that, if such a title was ever initiated or created, it was through Patrick's possession alone. The evidence shows no other actual possession than his, and no other use of the tide lands save the placing there of a small float. It does not definitely appear that even this was done or authorized by the respondents. Patrick's possession was not adverse to the true title. His testimony makes it clear that he never claimed to own further than "to the water." Whenever the form of the questions made him seem to say that he claimed to the meander line, he immediately returned to his first assertion that he did not know there was a meander line and that he supposed he bought "to high water or bought out to the water." Finally he made it too clear for doubt that he only claimed to the line of high tide. When asked what he meant by the water line, he said: "Well I meant to where the high tide generally comes, or about there," and, "My boat shop was outside of that altogether." On cross-examination he also made it clear that he supposed the tide land belonged to the government and that he supposed that, because he owned the property above, he had the right to the tide land, but that he never thought he bought it from the appellant Novak.

This case is clearly ruled by the case of *McNaught-Collins Improvement Co. v. May, supra,* and the other decisions cited in connection with it. To hold otherwise would

be to return to the doctrine of *Johnson v. Conner*, which has been several times discredited and twice overruled in terms.

The respondents place their reliance, in the main, upon the decisions in *McCormick v. Sorenson*, 58 Wash. 107, 107 Pac. 1055, 137 Am. St. 1047; *Naher v. Farmer*, 60 Wash. 600, 111 Pac. 768; and *Wissinger v. Reed*, 69 Wash. 684, 125 Pac. 1030. In the light of the foregoing well established principles, these cases are so readily distinguishable from the case before us on the facts as to render a review of them a bootless task.

The judgment is reversed, with direction to dismiss the action.

MORRIS, C. J., FULLERTON, MAIN, and CROW, JJ. concur.