[No. 1108-2.    Division Two.    March 18, 1974.]

HAROLD SISSON et al., *Appellants*, v. EUGENE KOELLE et al.,
*Respondents*.

*Jack J. Lobdell,* for appellants.

*Gerard A. Johnson* and *Bart Irwin* (of *Wilson, Platt &
Johnson*), for respondents.

ARMSTRONG, J.—This is an action brought by plaintiffs
Harold and Edna Sisson alleging that defendants had
erected buildings which encroached upon their land. Plain-
tiffs sought a decree that the buildings be removed and that
damages for the encroachment be assessed. The trial court
denied plaintiffs' claim and decreed that the defendants
were entitled to the lands and premises in question.

The first issue raised by this appeal is whether the trial
court correctly found that Clallam County, a predecessor in
interest to the plaintiffs, had held a portion of the disputed

land in a proprietary, as distinguished from a governmental, capacity. The second issue is whether the trial court correctly concluded that defendants acquired title to the disputed lands under the doctrine of adverse possession. We affirm the trial court in both respects.

The record discloses that in 1961 or 1962, plaintiff Harold Sisson noticed an advertisement in one of the local newspapers that some property at the west end of Lake Crescent was up for tax sale. The property being foreclosed was a narrow strip situated between land within the Olympic National Park to the north, and the defendants' property, commonly known as the Fairholm Resort, to the south. Some time after observing the published legal notice of the impending tax foreclosure, Mr. Sisson contacted the record titleholder, a Mr. Fairservice, and began negotiations to acquire the property.

Although he admitted that he had never closely inspected the property and that he did not know specifically where it was located, Mr. Sisson most candidly revealed the reason for his desire to acquire the property in the following testimony:

No, I didn't know where the property was, because I took my wife down in the campground and I said, now from this creek it runs North. I hadn't checked the description very good, and I told her, well, it's somewhere here North. The park forgot to buy this and we'll just get it and maybe we'll make a few dollars out of it.

. . .

I figured it was a piece that they hadn't acquired through some reason, which I didn't know, and that is what I told my wife, I says here, it lies in here, we'll buy that and we'll turn it over to the park and maybe make a few dollars.

Upon contacting the record titleholder, Mr. Sisson acquired the property for $1,000. One deed which contained an incorrect description was delivered first, so a correction deed was executed. Then, after that, Mr. Sisson secured another quitclaim deed "just in case those two weren't correct." It was while plaintiffs were attempting to obtain a

deed with a valid and correct legal description, that Mr. Sisson first discovered that the property he was purchasing was not where he had first thought; *i.e.*, north of the creek and within the area ostensibly controlled by the National Park, but rather south of the creek and running through a portion of what had been for more than 30 years the Fairholm Resort. Mr. Sisson also discovered, after considerable work, that the valid description to the property he had acquired did not include all of the property between defendants' Fairholm Resort and the Olympic National Park. He discovered that Clallam County held title in fee simple to a narrow strip of land between his recently acquired parcel and the defendants' property.

Apparently seeing yet another opportunity to "make a few dollars," plaintiffs in December of 1970, were successful in securing a judgment and decree quieting title in their behalf to this second narrow parcel as against the claims of Clallam County or any of its successors.

Armed with the $1,000 deeds to the Fairservice parcel, and the decree quieting title to the county's former property, plaintiffs, in May of 1971, commenced the instant action for damages caused by the encroachment of defendants' resort complex which was valued in excess of $200,000.

Plaintiffs were unsuccessful in this action. The trial court found that plaintiffs had acquired no interest in the disputed property because defendants' predecessors in interest had acquired both parcels by adverse possession prior to either execution of the quitclaim deeds or the action quieting title against Clallam County.

Plaintiffs, in this appeal, argue that title to the land held by Clallam County could not be acquired by adverse possession. In support of this contention plaintiffs cite RCW 7.28.090 and *Goedecke v. Viking Inv. Corp.*, 70 Wn.2d 504, 424 P.2d 307 (1967), for the proposition that adverse possession does not run against a governmental body holding land for public purposes. It is obvious that this proposition is fundamentally correct. However, it is also true that if land is held by a governmental body in its proprietary, as

opposed -to governmental capacity, the land is subject to being acquired by adverse possession the same as if owned by a private individual. *Commercial Waterway Dist. 1 v. Permanente Cement Co.,* 61 Wn.2d 509, 512, 379 P.2d 178 (1963); *Gustaveson v. Dwyer,* 83 Wash. 303, 305, 145 P. 458 (1915).

Here the record reflects that Clallam County acquired this disputed property along the west end of Lake Crescent in 1920 as part of a transaction with the Sol Duc Hot Springs Corporation. The Sol Duc Corporation conveyed one parcel, in fee simple, in the area now claimed by plaintiffs, another parcel in fee simple in the area owned by defendants, and a 30-foot road right-of-way running from the lake across the two parcels conveyed in fee simple, and then all the way to the Sol Duc Hot Springs. There was testimony indicating that there was once a ferry landing where the two separate parcels were. All that remained were some of the old pilings, still visible in front of a restaurant constructed by the defendants. Apparently the ferry became obsolete or unprofitable to operate about the time the state constructed Highway 101 in the early 1920's.

It is clear from the record that the disputed property, at one time, was part of a transportation system providing access to the Sol Duc Hot Springs. It is from this fact that plaintiffs base their claim that Clallam County held title to the property for a public purpose.

Plaintiffs point out that in 1958, defendants' immediate predecessor in interest, Mrs. Lenore, petitioned Clallam County to vacate the portion of the right-of-way commencing at the old ferry landing and continuing to the west end of the disputed property. Plaintiffs produced testimony from one of the members of a survey crew which posted notices of the hearing on Mrs. Lenore's petition. He testified to the effect that no notice was posted at the end of the right-of-way at the shore of the lake. Plaintiffs then argue that since the law requires the posting of a notice at each termini of the road proposed to be vacated, the county resolution ultimately vacating the right-of-way was there-

fore void. Laws of 1937, ch. 187, § 51, at 761, reenacted in RCW 36.87.050; *Elsensohn v. Garfield County,* 132 Wash. 229, 231 P. 799 (1925). In contradiction to this testimony, the record contains a sworn affidavit subscribed in 1958 certifying that one copy of the notice was posted on each end of the road proposed to be vacated. The trial court did not determine whether the vacation was proper, and it similarly is unnecessary for us to address this issue, because there is nothing in the record indicating that a county road was ever dedicated, created, established, or opened across the land in question. Indeed, plaintiff Mr. Sisson, who testified that he spent several days examining the records concerning the disputed property, stated during direct examination:

Q As a matter of fact, Mr. Sisson, are there any records that can be found that shows that a road was ever established there?
A No.
Q A road was, a right of way was vacated, however?
A I found that out after we had quieted title, because the deeds did not call for any road ever in there.
Q Just that the Clallam County owned some land there alongside the Fairservice land, is that right?
A They owned two pieces of land they bought from Mrs. Rickson.[1]

---

[1]Mr. Sisson reiterated this testimony on redirect, and again during recross-examination:
Q Mr. Sisson, have you examined the county roads to determine whether or not the Clallam County ever established a road down there, dedicated road to the public?
A I never could find anything and I spent days, several days, not one day. It was several days going through.
Q Did you work in conjunction with the county engineers?
A I went up there and looked through the books and John, in fact, helped me.
Q And you never could find any creation of a road by Clallam County down there?
A No.
MR. LOBDELL: I have no further questions, your Honor.
RECROSS EXAMINATION
(BY MR. CHAMBERLIN)
Q There was a road there that the county maintained and vacated wasn't there, Harold?

■ The trial court found that Clallam County had "abandoned and forgotten about and had done nothing to sustain any title, or ownership, or control, of the land in question." We are mindful of the holding in *Goedecke v. Viking Inv. Corp., supra,* that an abutting property owner does not acquire by adverse possession any part of a public right-of-way to which a municipal corporation has title, and that a public road does not lose its character as a public road because no public funds are expended for its maintenance and upkeep. However, in this case there is nothing in the record indicating that the disputed property was ever devoted, reserved, or set apart for use as a public right-of-way, or for any other public use. Since the record reflects merely that the county held title in fee simple to a parcel of lakeside property, which the county had never devoted to any use, public or otherwise, we are of the opinion that the multitude of digested cases holding that a public way may not be acquired through adverse possession are not on point. We therefore hold that the disputed property was held in a proprietary capacity and subject to adverse possession the same as if owned by a private individual. *Commercial Waterway Dist. 1 v. Permanente Cement Co., supra* at 512.

■ The remaining issue for consideration is whether

A There was a road right of way up to the edge of the property and according to record there is no, according to record that the road ever was inside of the property. They owned that fee in simple property.

Q Did you ever check the commissioner's records?

A I read ten years of them, word by word.

Q Did they vacate a county road?

A They came along in 1958, but I read records back in the 30's and early 30's.

Q They did vacate a road though, didn't they, in 1958?

A In '58 they vacated a road and Mr. Hubbard was out there with us and showed us where he posted the signs, because he said it was conflicting to him where they were asking for that, because they had checked with legal descriptions and found out that they owned property fee and simple property and he figured the road was on the outside of that, because they owned this property and then they bought the right of way afterwards.

the trial court correctly determined that the interest of the plaintiffs in the disputed property was acquired by the defendants under the doctrine of adverse possession. We begin by repeating the frequently recited litany:

[T]o constitute adverse possession, there must be actual possession which is uninterrupted, open and notorious, hostile and exclusive, and under a claim of right made in good faith for the statutory period.

*Butler v. Anderson,* 71 Wn.2d 60, 64, 426 P.2d 467 (1967); *Skansi v. Novak,* 84 Wash. 39, 45, 146 P. 160 (1915).

Somewhat ironically, counsel for plaintiffs conceded that the only "element" of adverse possession which they are challenging is whether the defendants occupied the property under a "claim of right made in good faith." Plaintiffs' position is apparently predicated upon three facts. The first is that during the possession of Mrs. Lenore, defendants' predecessor, there was a cabin located on the disputed property once occupied by a Mr. Keister, who had in his possession a lifetime lease, given for nominal consideration and executed in 1933, from Mr. Fairservice, plaintiffs' predecessor. Plaintiffs argue that Mrs. Lenore must have known that Keister did not acquire his lease from her and that she therefore could not have claimed in good faith the land upon which Keister had his lifetime lease. The second fact urged by plaintiffs as negating good faith on the part of the defendants is the fact that a National Park official testified that he informed the defendants, that there was a "shadow" on their claim of ownership of the disputed lands all the way to the creek, and further, that a survey done on their behalf indicated their legal boundary lines did not run that far. Plaintiffs argue that if defendants were "serenely confident" of their good faith claim of ownership, then their act of ordering a survey becomes inexplicable. Plaintiffs finally argue that good faith is negated by the fact that defendants constructed a restaurant on the disputed property after the survey indicated their legal descriptions did not encompass all the land which defendants claimed.

It should be obvious that plaintiffs' argument re-

flects a fundamental misconception of the nature of adverse possession. First of all, it is clear in this state that the "claim of right" which the doctrine of adverse possession contemplates is simply that the claimant is in possession as owner, with the intent to claim the land as his own, and not in recognition of or subordination to the record title owner. *Bowden-Gazzam Co. v. Hogan*, 22 Wn.2d 27, 35, 154 P.2d 285 (1944); *Fisher v. Hagstrom*, 35 Wn.2d 632, 645, 214 P.2d 654 (1950).

As to the requirement that the claim of right be "made in good faith,"[2] we feel it is sufficient to simply point out that it is absolutely clear from the record that at least since 1927, when the Lenores acquired their interest, the Lenores and their successors, including the defendants, had a bona fide belief and asserted a good faith claim that the Fairholm Resort property ran at least as far north as the creek, and from that point, the remaining property was held by the National Park. The record reflects that there were several cabins located on the disputed property, in addition to the cabin once occupied by Mr. Keister, and that these cabins have consistently been rented to the public by first the Lenores, and subsequently by the defendants.

We find nothing in the record that in any way indicates

---

[2] We note that there exists somewhat of a controversy among the property scholars as to whether good faith should be required at all, and a good deal of confusion as to what exactly "good faith" means in the context of adverse possession. *See, e.g.,* W. Stoebuck, *The Law of Adverse Possession in Washington*, 35 Wash. L. Rev. 53, 83 (1960); 3 *American Law of Property* § 15.4(b), at 773-85 (1952); 6 R. Powell, *Real Property* ¶ 1015, at 731 (1973); 4 H. Tiffany, *Real Property* § 1147, at 445 (3d ed. 1939); 5 G. Thompson, *Real Property* § 2553, at 580 (repl. 1957); 3 Am. Jur. 2d *Adverse Possession* §§ 97-104 (1962). It should be emphasized, however, that Washington's 10-year statute, RCW 4.16.020, must be distinguished from the 7-year color of title statute which *expressly* requires possession under claim and color of title *made in good faith,* with payment of taxes. RCW 7.28.070. *Ramsey v. Wilson,* 52 Wash. 111, 100 P. 177 (1909), appears to be one of the first cases in which the color of title good faith requirement was blended into the law of adverse possession under the 10-year statute, to be merely repeated as one of the requirements of adverse possession thenceforth. *See Skansi v. Novak,* 84 Wash. 39, 45, 146 P. 160 (1915); *Roesch v. Gerst,* 18 Wn.2d 294, 306, 138 P.2d 846 (1943).

that the successive owners of the Fairholm Resort were not asserting a good faith claim that they owned all of the property as far north as the creek. We further find that no conduct of the defendants, with regard to resolving the difficult problems that confronted the various surveyors and National Park officials in their attempts to apply the legal descriptions to the actual property, in any way detracted from their good faith claim to the property. Besides, by the time the conduct occurred which plaintiffs urge as negating good faith on the part of the defendants, the defendants' predecessors in interest had already been in actual possession, which was open and notorious, hostile and exclusive, and under a claim of right made in good faith for a period well in excess of the 10 years required by statute.

The judgment of the trial court that any interest of the plaintiffs in the disputed property was acquired by the defendants through adverse possession is therefore affirmed.

PEARSON, C.J., and PETRIE, J., concur.