[No. 2095-1.   Division One.   July 15, 1974.]

ROY E. JACKSON *et al., Appellants*, v. WELDON J. PENNINGTON *et al., Respondents*.

*Jackson, Ulvestad & Goodwin* and *Daniel C. Goodwin* and *James A. Grutz*, for appellants.

*Montgomery, Purdue, Blankinship & Austin* and *Jerry W. Spoonemore*, for respondents.

HOROWITZ, J.—Plaintiffs Jackson appeal a judgment dismissing their complaint based on a claim of adverse possession to a parcel of land located in a platted area in Seattle, Washington, known as Magnolia Heights, and quieting title in defendants Pennington to that disputed parcel.

The controlling question presented is whether there is sufficient evidence of hostile possession against the City of Seattle to support three challenged findings of fact and four challenged conclusions of law generally supporting the position that the required hostile possession is missing to make out a case of adverse possession against defendants Pennington.

Most of the findings of fact are unchallenged, making it unnecessary to review evidence bearing on such findings presented in great detail below. The disputed area is shown on an illustrative map of the area contained in the appendix to this opinion. The map shows the Pennington property lies south of and adjoins the Jackson property. Each property at its easterly end abuts upon Ruffner Street. Proceeding from Ruffner Street in a generally westerly direction toward the tidelands of Puget Sound, a point is

reached where a platted, unimproved street or parkway called the Esplanade crosses the Jackson and Pennington properties in a generally northwesterly-southeasterly direction. The disputed parcel is included in the Pennington deed description, but not in the description contained in the Jackson deed. That parcel, as shown on the map, is located principally within the Esplanade. The Jacksons claim title to that parcel by adverse possession for at least 10 years.

The challenged findings and conclusions set out in footnote 1, *infra*, deal with the issue of hostile possession as that term is understood in Washington in the law of adverse possession. A reading of the findings and conclusions —particularly conclusion of law No. 2—may prove helpful to an understanding of the somewhat complicated facts of the case next stated.

The material facts as the court found or could have found them, bearing on the issue of hostile possession, are these. In 1928 and 1933, the Pauls and other owners of property abutting upon the Esplanade petitioned the City of Seattle to vacate a portion of the Esplanade in and along the easterly side thereof. The two petitions called for a combined width of the vacation of about one-half of the Esplanade as platted. The City on each occasion agreed to grant the petitions of the abutting property owners on condition they quitclaim to the city for street purposes their interest in the vacated portion of the Esplanade, the abutting owners to reserve the right for a 15- or 20-year period, respectively, to use and occupy the vacated property. The vacations were effected and the abutting property owners delivered their required deeds. The City in 1953 accepted these deeds pursuant to an enabling city ordinance.

In 1944 Mrs. Paul, the surviving widow of the Pauls, sold the Haslunds the land now owned by the Penningtons. Mrs. Paul conveyed by warranty deed most of the property sold, but she merely quitclaimed to the Haslunds whatever interest she had in the Esplanade by virtue of the 1928 and 1933 transactions with the City. In November 1945 Mrs. Paul sold the Smiths the land now owned by the Jacksons.

Her conveyance included a quitclaim of her interest in portions of the Esplanade lying north of the northerly boundary of the land she had conveyed to the Haslunds the year before.

In 1945 the Pauls and other property owners abutting the Esplanade petitioned the City for a total vacation of the Esplanade abutting their property and covered by the 1928 and 1933 transactions. The City Council denied this petition. In 1946 the Smiths joined all other property owners abutting the Esplanade in signing a petition for a total vacation. The petition described the Esplanade as a city street and referred to the areas previously vacated pursuant to ordinance. This second petition was likewise denied June 3, 1946.

On June 20, 1946, the Smiths obtained a building permit to construct a beach cottage down the hill toward Puget Sound from their upland property. The proposed cottage location was not on land previously conveyed to the Smiths by Mrs. Paul. It was to be situated a few feet north of the northerly boundary of the land in the Esplanade plaintiffs seek to acquire by adverse possession. The Smiths knew of the existence of the Esplanade, but appear not to have known that the proposed cottage was to be located almost entirely on the Esplanade. Following construction, the Smiths occupied the beach cottage. The Smiths believed themselves to be the owners of the land on which the cottage stood. They and their subsequent tenants during the period of the Smith ownership, without objection from anyone, cleared, improved and used the general area adjoining the cottage to a wire fence which appeared to them to mark the southerly boundary of their property.

In 1952 the Smiths sold their land to the Johnstons. The Smiths' deed did not include the disputed area. Between 1952 and 1955, the Johnstons and their tenants continued to use the beach cottage and the adjoining land to the wire fence in the same manner as had the Smiths. In 1953 the 20-year period expired subsequent to the 1933 arrangement between the property owners abutting the Esplanade and

the City. In that year the City, by means of an enabling ordinance, formally accepted the 1928 and 1933 deeds to the lands in the Esplanade vacated in those years.

In 1955 the Johnstons sold and deeded their property to the plaintiffs Jackson. The Johnston deed, as in the case of the earlier Smith deed to the Johnstons, did not convey the disputed parcel to the Jacksons. Although the deeds and title insurance policy upon examination and study would have shown the Jacksons that they did not cover the disputed parcel, these instruments were not sufficiently examined upon delivery to disclose to the Jacksons that the instruments did not cover the disputed area. After the 1955 purchase, the Jacksons and their tenants continued to use the cottage and the disputed parcel in the same way as had the Johnstons and Smiths before them.

In 1958 plaintiffs' cottage tenant began remodeling the cottage. The city "red-tagged" the project because no building permit had been obtained. Plaintiffs, after Mrs. Jackson corresponded with Mr. Smith for information concerning the correct property line and received an insufficiently informative response, requested the Board of Public Works of the City of Seattle to approve the granting of a building permit. Plaintiffs' plat map, attached to their application, showed the Esplanade and abutting property. In the first vacated strip was the note "Vac. Ord. 56455 — Deeded to City effective 11-30-43," and in the second vacated strip, "Vac. Ord. 63671—Deeded to City effective 4-28-53." In the letter of application plaintiffs stated that the cottage was located "on vacated Sound View Avenue and the Esplanade [sic]."

On June 4, 1958, the Board of Public Works approved the granting of a building permit "subject to obtaining also a permit for all street area which is being used." It was the City's position the cottage was principally located in the Esplanade area belonging to the City. Without further inquiry from or objection to the City, plaintiffs formally applied for a building permit and a street-use permit. Both applications were granted. The street-use permit dated July

28, 1958, granted plaintiffs the right to "maintain cottage in street area—707 [square feet] (including 7′x16′ addition) app'd BPW 6-4-58" at an annual street use rental of $70.70. Plaintiffs paid this sum annually from 1958 until at least 1970. In the meantime, on June 10, 1958, plaintiff husband, in writing Mr. Smith for further information regarding the location of the cottage, stated that "since the cottage is on street property, we will have to pay a street use fee."

In the early 1960's, plaintiffs discussed with the Haslunds and two other neighbors a possible joint repair project to a bulkhead situated upon the Esplanade and the possibility of seeking a vacation of the Esplanade by the City, or of otherwise extinguishing the City's interest. The task of investigating these possibilities was delegated to plaintiff Jackson, a lawyer. Later he and another neighbor discussed the City's interest in the Esplanade and the possibility of extinguishing it.

On June 25, 1965, the Haslunds sold and conveyed to the Penningtons a portion of their property which included the disputed parcel of land. Messrs. Haslund and Pennington discussed the City's interest in the Esplanade and the area now identified as the disputed parcel. In 1968 and 1970, respectively, defendants and others sued the City of Seattle to quiet title in them to the portions of the Esplanade previously conveyed to them and abutting their lands. Plaintiffs were not parties to that litigation. These suits were not based upon adverse possession. On February 9, 1970, and March 30, 1971, judgments were entered which extinguished the rights of the City of Seattle in the vacated portions of the Esplanade claimed and determined *inter alia* that the Penningtons were the owners in fee simple of the area in the Esplanade which is the subject of this suit.

Later, plaintiffs sued defendants asserting title by adverse possession to the disputed parcel of land. After trial, the court entered findings, conclusions and judgment favorable to defendants. Plaintiffs' appeal followed.

Plaintiffs contend certain controlling findings of fact and

conclusions of law set out in the margin,[1] and concerned

[1]"In 1928, and again in 1933, these efforts on the part of the abutting property owners to have the City vacate The Esplanade resulted in arrangements whereby the City, after first obtaining Quit Claim Deeds from all the abutting owners to any interest that they may have had in The Esplanade, passed vacation ordianances [sic] No. 56455 and No. [63671] respectively. These vacations involved two abutting strips along the easterly side of The Esplanade property, and their combined width comprised approximately one-half of The Esplanade as platted. As a result of these transactions it was generally believed that these two strips had been vacated for periods of fifteen and twenty years respectively, and that the strips of The Esplanade so vacated would revert to the City after the expiration of said periods of time. Both the 1928 and the 1933 petitions for vacation were signed by the Pauls, remote grantors of both the plaintiffs and the defendants." Finding of fact No. 3.

"At the time of their purchase of the upland and tideland property, and at all times subsequent thereto, the plaintiffs Jackson knew that the City of Seattle claimed a superior interest in The Esplanade, including the property which is the subject matter of this action." Finding of fact No. 15.

"At all times prior to at least 1970, it was the general belief among residents of the general Magnolia area near The Esplanade, and in particular the owners of property immediately abutting The Esplanade, including the parties hereto and their predecessors in interest, that the City owned or at least claimed an interest in and to The Esplanade property." Finding of fact No. 19.

"At all times pertinent to this action the plaintiffs Jackson and their predecessors in title were aware of the fact that the City of Seattle claimed some interest in The Esplanade." Conclusion of law No. 1.

"The use and occupation of the property in dispute by plaintiffs Jackson and their predecessors satisfied all elements of adverse possession as against all persons or entities except the City of Seattle. The knowledge by the Jacksons and their predecessors that the City of Seattle claimed some interest in the property known as The Esplanade caused the use and occupation of the property in dispute by the Jacksons and their predecessors to lack the requisite element of hostility necessary to a successful assertion of an adverse possession claim." Conclusion of law No. 2.

"Since the use and occupation of the property in dispute by the Jacksons and their predecessors was not hostile against the City of Seattle, their claim of adverse possession against the defendants must fail." Conclusion of law No. 3.

Neither the trial court nor plaintiffs, in dealing with the subject of title by adverse possession, distinguished between the disputed area located within the Esplanade and the small tip at the easterly end of that area located outside the Esplanade. In disposing of the errors assigned, we likewise made no distinction as indicated.

with the existence and significance of hostile possession, are unsupported by substantial evidence. We do not agree and uphold the challenged findings, conclusions and judgment, which we discuss together.

The existence of the elements necessary to create a title by adverse possession raises questions of fact. The burden of establishing those facts is upon the person claiming title by adverse possession. *Rognrust v. Seto*, 2 Wn. App. 215, 467 P.2d 204 (1970). The parties are agreed that, in order for one to acquire title by adverse possession, the often stated rule is the possession must be "actual and uninterrupted, open and notorious, *hostile* and exclusive, and under a claim of right made in good faith." (Italics ours.) *Skansi v. Novak*, 84 Wash. 39, 45, 146 P. 160 (1915). According to many cases, the claimant must be in possession as owner against the whole world and not in a manner subordinate to the interest or title of another. *E.g., Skansi v. Novak, supra; McNaught-Collins Improvement Co. v. May*, 52 Wash. 632, 101 P. 237 (1909); *Vick v. Berg*, 251 Ark. 573, 473 S.W.2d 858 (1971); *Wanex v. Hurst*, 188 Md. 520, 53 A.2d 38 (1947). Even if subordinate possession is based on a mistaken belief the governmental entity owns the land, the necessary hostility is missing. In *Thorsteinson v. Waters*, 65 Wn.2d 739, 748, 399 P.2d 510 (1965), the court said:

> Iwersens did not, prior to the 1958-1959 surveys, exercise any dominion over the disputed strip inconsistent with the accepted belief that such property belonged to the government. And, in any event, an entry on and possession of land under the mistaken belief that it is public land will not operate to disseize the true owner, for the reason that the element of hostility is absent.

*See also Krona v. Brett*, 72 Wn.2d 535, 433 P.2d 858 (1967); *El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 376 P.2d 528 (1962); *Fisher v. Hagstrom*, 35 Wn.2d 632, 214 P.2d 654 (1950); *Skansi v. Novak, supra; McNaught-Collins Improvement Co. v. May, supra; Turner v. Rowland*, 2 Wn. App. 566, 468 P.2d 702 (1970).

To the extent that factual questions must be determined, *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959), applies. Under *Thorndike*, we are constitutionally unable to substitute our findings for those of the trial court if those findings are supported by substantial evidence.

A review of the record shows there is substantial evidence that the possession of the Jacksons and their predecessors in interest was a possession in subordination to the City's claim of title and therefore not a hostile possession. Such evidence may be found both in the case presented by the Jacksons and the case presented by the Penningtons. The Penningtons' case included the testimony of neighbors whose properties were near the Jackson and Pennington properties and certain of whom had resided in or near those properties for many years. In the Jackson case, a 1957 tenant of the beach cottage located on the Esplanade, when asked when he first heard of the Esplanade, testified: "I have heard of that I think ever since I have been around there." Dr. Mosiman, a nearby neighbor who attended a meeting with the Jacksons and others in the early 1960's, testified: "[A]t that time we all felt that the City owned the Esplanade property, . . ." He also testified the conversation included a discussion of past unsuccessful efforts to get the Esplanade vacated and efforts made to defeat the vacation "by a popular outcry with the little Magnolia News leading the charge because it was the only City-owned property along the bluff and the Park Department felt they wanted it as an access to the waterfront." According to Dr. Mosiman, it was as a result of the conversation that Mr. Jackson, who was a lawyer, was delegated to "look into the possibility . . . of trying to get it revacated." It was at that meeting the subject was brought up "that Mr. Jackson was paying rent to the City for the property he was using." The neighbors' testimony was generally to the effect that at no time did Mr. Jackson ever assert that he had title to the disputed parcel by adverse possession.

Important also is testimony concerning the past attempts

to vacate portions of the Esplanade after the 1928 and 1933 transactions by which the City vacated a portion of the Esplanade pursuant to city ordinance and received back from the affected property owners deeds to their interest in the vacated portions of the Esplanade, subject only to their reserved right to use the vacated portions for a fixed period of time. These deeds were accepted in 1953. The attempts to vacate, in effect, recognized the City had a superior interest or title in the Esplanade to vacate. The petitions to vacate were signed in one instance by Mrs. Paul, and in the other instance by the Smiths. *See Rapp v. Stratton,* 41 Wash. 263, 83 P. 182 (1905); *Unzelman v. Snohomish,* 40 Wash. 588, 82 P. 911 (1905).

The construction and use of the cottage by the Smiths and their use of the adjoining land to the wire fence to the south was not a hostile possession as to the City because the Smiths, knowing of the City's superior title to the Esplanade, did not know that the cottage and land to the south used by them was on the Esplanade. The evidence does not directly show whether the Johnstons who, in the period 1952-55 succeeded the Smiths in their ownership, knew whether the cottage or disputed parcel was within the Esplanade. It was during the Johnston occupancy, however, in 1953 the City accepted the 1928 and 1933 deeds to the vacated land in the Esplanade for street purposes. It is also significant the conveyances by the Smiths to the Johnstons, and by the Johnstons to the Jacksons, did not include the disputed parcel as part of the land now claimed by the Jacksons. Moreover, the title insurance policy covering the Jackson property did not insure the title to the disputed land. These facts, together with the common knowledge that might have been acquired by talking to the neighbors or the City concerning the Esplanade, put the Jacksons (and, for that matter, the Johnstons) on notice that the Jacksons did not own and that the City was claiming to own the Esplanade, on which the disputed parcel was located.

The most persuasive evidence the Jacksons acknowl-

edged the superior interest or title of the City to the Esplanade is found in the Jacksons' application for a street-use permit in the Esplanade and the payment of a fee or rent for that use for a period of 12 years ending in 1970. Prior to the application for a street-use permit in 1958, the Jacksons could have learned of the City's relationship to the Esplanade and of the location therein of the disputed parcel. Furthermore, they were put on notice and so were charged with knowledge of the fact that their deed did not convey to them title in any part of the Esplanade, including the disputed parcel. *Brewer v. Rosenbaum*, 183 Wash. 218, 48 P.2d 566 (1935). *See National Bank v. Equity Investors*, 81 Wn.2d 886, 506 P.2d 20 (1973); *Lake Air, Inc. v. Duffy*, 42 Wn.2d 478, 256 P.2d 301 (1953); *Copeland Planned Futures, Inc. v. Obenchain*, 9 Wn. App. 32, 510 P.2d 654 (1973). After their application for a street-use permit and during the entire period of payments of license fees or rent to the City for a 12-year period, the Jacksons had actual knowledge of the City's claim of superior interest or title to the Esplanade for the use of which the Jacksons were charged a fee or rent. The street use permit application and the payments made pursuant thereto evidenced the Jacksons' recognition of the City's superior interest or title. *See Magelssen v. Cox*, 68 Wn.2d 785, 788, 415 P.2d 645 (1966); *State v. Stockdale*, 34 Wn.2d 857, 210 P.2d 686 (1949); *Roesch v. Gerst*, 18 Wn.2d 294, 138 P.2d 846 (1943); *Unzelman v. Snohomish, supra*; 4 H. Tiffany, *Real Property* §§ 1178, 1180 (3d ed. 1939); 3 Am. Jur. 2d *Adverse Possession* §§ 82-83 (1962).

The Jacksons argue they elected to pay the street use payments, not as a recognition of the City's superior interest, but to enable them to expeditiously proceed with their improvements without litigation to resolve the validity of the City's claim. *See* finding of fact No. 17. There is no evidence or finding the application and payments were over protest or objection or, for example, the result of duress, business compulsion, fraud, or undue influence as those doctrines are currently understood. *See Rosellini v. Ban-*

*chero,* 8 Wn. App. 383, 506 P.2d 866 (1973), *rev'd on other grounds,* 83 Wn.2d 268, 517 P.2d 955 (1974); *Pleuss v. Seattle,* 8 Wn. App. 133, 504 P.2d 1191 (1972). The application and payments were no doubt unpalatable, but they were legally voluntary. The City in good faith asserted its title to the Esplanade. Plaintiffs, without objection made to the City, applied for the street-use permit and paid fees or rents, thereby recognizing the City's claim of ownership, albeit reluctantly. They thereby became bound by the election so made. *See Pleuss v. Seattle, supra.*

Dr. Mosiman testified to a conversation with Mr. Jackson in the early 1960's about the possibility of

> clearing our title to that Esplanade property and getting it from the City, . . . he indicated to me that first of all he wasn't paying the City very much and that he wasn't a great deal interested in a lot of extra expense . . . and that he was happy with the situation the way it was.

His testimony is consistent with the testimony that at no time prior to the 1970 and 1971 judgments decreeing the Penningtons to be the owners of the disputed parcel of land in the Esplanade did plaintiffs or their predecessors in interest ever assert that they held title in the disputed parcel by adverse possession, or that the City did not have the superior rights and title it claimed in the Esplanade. It is true such assertions were not essential to a claim of adverse possession (*Krona v. Brett,* 72 Wn.2d 535, 433 P.2d 858 (1967)), but their absence is consistent with the view that the needed hostile possession is missing.

The likelihood that the possession of plaintiffs and their predecessors in interest was not hostile is increased when it is recalled that one may not acquire title by adverse possession to its land, including a public street, as against a municipal corporation. *Goedecke v. Viking Inv. Corp.,* 70 Wn.2d 504, 424 P.2d 307 (1967); *Commercial Waterway Dist. 1 v. Permanente Cement Co.,* 61 Wn.2d 509, 379 P.2d 178 (1963); *Rapp v. Stratton, supra; West Seattle v. West Seattle Land & Improvement Co.,* 38 Wash. 359, 80 P. 549

(1905); *Finley v. Jordan,* 8 Wn. App. 607, 508 P.2d 636 (1973). This rule is consistent with and supplements the rule that without hostile possession the claimed adverse possessor cannot acquire title to the land. *Thorsteinson v. Waters,* 65 Wn.2d 739, 399 P.2d 510 (1965); *McNaught-Collins Improvement Co. v. May,* 52 Wash. 632, 101 P. 237 (1909); *Yesler Estate, Inc. v. Holmes,* 39 Wash. 34, 80 P. 851 (1905).

The trial court stated it felt

> confident that over all of these years all of the interested parties knew that there was a cloud on the title to the property located within the Esplanade. I think they all knew that in the background was the City of Seattle with its claim to title commencing in 1953, and that has indeed occurred when that year came the City Council, passed an ordinance and accepted the deeds from all the property owners which had been given at the time the Esplanade was vacated.

The court found, in challenged finding of fact No. 15 set out in footnote 1, *supra,* that when the Jacksons purchased their property and at all times thereafter they knew the City claimed a superior interest in the Esplanade. The court properly concluded, on the basis of evidence it had a right to accept, that "the requisite element of hostility necessary to a successful assertion of an adverse possession claim" is missing. Conclusion of law No. 2. The finding and conclusion mentioned were within the power of the court to enter.

Plaintiffs argue possession in subordination to a mere claim of ownership, as distinguished from ownership itself, all other elements being present, satisfies the requirements of adverse possession. The argument in effect waters down the requirement the possession must be a hostile possession against the entire world. Plaintiffs cite no direct authority to support their argument on this point. Instead, they call attention to cases holding the purchase by the adverse possessor of a third person's outstanding adverse claim to the property does not interrupt the acquisition of title by ad-

verse possession. They cite cases such as *State v. Stockdale, supra*; *Lewis v. Seattle*, 174 Wash. 219, 24 P.2d 427, 27 P.2d 1119 (1933); *Silverstone v. Hanley*, 55 Wash. 458, 104 P. 767 (1909); *Schlossmacher v. Beacon Place Co.*, 52 Wash. 588, 100 P. 1013 (1909). These cases recognize the adverse possessor may acquire the claims of third persons as a matter of convenience to eliminate what the adverse possessor considers to be a subordinate interest. The purchase in such a case is not a recognition of a paramount interest as would be the case of the purchase to eliminate a paramount interest. Whether the purchase of the claim is or is not a recognition of the paramount or subordinate nature of the claim purchased is a question of fact necessarily resolved in the instant case against the plaintiffs. *See* finding of fact No. 19 set out in footnote 1, *supra. Altschul v. O'Neill*, 35 Ore. 202, 58 P. 95 (1899); Annot., 125 A.L.R. 825, 826 (1940); 3 Am. Jur. 2d *Adverse Possession* § 85 (1962). In any event, the analogy falls short of mandating the abandonment of the requirement of hostile possession in the manner claimed.

Plaintiffs contended below and on appeal they were relying upon continuous adverse possession for 10 years by plaintiffs and their predecessors in interest under the doctrine of tacking. RCW 4.16.020; *Rognrust v. Seto*, 2 Wn. App. 215, 467 P.2d 204 (1970). The doctrine is inapplicable. Plaintiffs' predecessors in interest held the disputed parcel in the Esplanade in subordination to the interest of the City therein. Plaintiffs themselves did not adversely possess the disputed parcel, after learning the City had no title, for the required 10-year period after 1970 when they ceased paying street-use fees or rent to the City. *McNaught-Collins Improvement Co. v. May, supra*. The decree quieting title in the Penningtons was proper.

Affirmed.

SWANSON, C.J., and WILLIAMS, J., concur.

Petition for rehearing denied August 26, 1974.

Review denied by Supreme Court November 19, 1974.