JOSEPH, J.
The State of Oregon brought this action in ejectment to recover possession of a 1.5 acre tract. Defendant asserted title by adverse possession as an affirmative defense and counterclaimed for trespass. The trial court, sitting without a jury, found defendants to have title by virtue of their predecessor’s adverse possession. The state appeals.
It was stipulated that the state has a good record title to the disputed property and the defendants have no record title to any of it. By their affirmative defense defendants put in issue title in themselves or third persons, and the burden of proof was theirs. We review to determine whether there was substantial evidence to support the trial court’s determination that defendants have made out a title by adverse possession in someone which was good against the state. Du Val v. Miller, 208 Or 176, 300 P2d 416 (1956).
On the accompanying diagram the land to which the defendants have a record title lies west of the Donation Land Claim line and is designated R. The land to which the state has record title lies east of the Donation Land Claim line and is designated S. Within the bounds of S is the triangular tract (designated D), which is the subject of this dispute. Its westerly line is the Donation Land Claim line. The easterly line to which defendants lay claim is about 470 feet long; the northerly line is about 250 feet long.
*[720] [[Image here]]
*[721] The history of the record titles to tracts S and R is shown by the following:
[[Image here]]
*[722] None of the documents in the various transactions specifically mentioned or delineated tract D. In 1976 Downey and Richards quitclaimed any interest they might have in tract D to the Rosanbalms.
The Rosanbalms advanced at least three theories in support of their claim to the triangle. First, they claim Hoyt acquired title by adverse possession against Boone and Bishop prior to their 1957 sale of tract S to the state. Second, Rosanbalms claim their adverse possession and Downey and Richards’ adverse possession should be tacked and the Rosanbalms, as successors to Downey and Richards, got the resulting title by adverse possession against Hoyt.[1] Third, they also claim they have gained title in their own right by adverse possession against the state since 1964. Although it does not appear definitively in the record, the pleadings and the evidence amount to a further claim that by tacking adverse possession by Hoyt and Downey and Richards, a title was acquired by the latter which would defeat the state’s claim. [2]
The "Order and Decree” entered below is not clear as to which of the theories the court decided was proved. It recited as findings of fact that "the State exercised no dominion and control over the land * * * for any purpose until shortly before the filing of its Complaint” and that the Rosanbalms’ "predecessors had used the land described herein for many years prior to the time of the State’s deed.” Furthermore, there was another so-called finding of fact "[t]hat the land * * * is vested [in defendants] by virtue of adverse possession by their predecessors in interest.”[3] *[723] The only thing that is clear is that the trial court did not find that the Rosanbalms had made out a title by adverse possession by their own actions.
Hoyt’s deed to Downey and Richards did not convey tract D. i^Hoyt had gained a title by adverse possession, then the Rosanbalms would not have had to show that they, or they and Downey and Richards, got title by adverse possession against Hoyt. Even though Hoyt is not a party here and title as between Rosanbalms and Hoyt cannot be determined, the Rosanbalms can defeat the state by showing title in Hoyt. ORS 105.055.
 An issue is raised whether title by adverse possession can be obtained hgainst the state. We need not reach that question if Hoyt had adversely possessed tract D against Boone and Bishop by the time Bishop conveyed to the state in 1957. We begin with that inquiry, noting that each element of adverse possession must be shown by clear and positive proof. Fry v. Woodward, 221 Or 39, 350 P2d 183 (1960); Du Val v. Miller, supra[4]
There is no evidence that any predecessor of Hoyt claimed tract D. There was evidence that shortly after Hoyt acquired tract R in 1944, or by 1947 at the latest, he fenced his entire property, including along the Donation Land Claim line. Be that as it may, the evidence is clear that when he started his use of tract D there was untrammeled access across the Donation Land Claim line for the piling of gravel from his mining operation. A short section of fence has apparently existed along the southerly portion of the Donation Land Claim line north of the point where the easterly line of tract D meets the Donation Land Claim line. It appears that that fence was not built, maintained or repaired by Hoyt, his successors or the state, and is a mere relic of a long disused barrier *[724] which was there before Hoyt owned tract R. Hoyt did not fence the easterly or northerly lines of tract D until 1951 or 1952.
Prior to 1953, and possibly as early as 1947 or 1948, Hoyt or others mining gravel on his property piled a substantial amount of the gravel in the area shown as "Gravel Pile” on the accompanying diagram, supra at page la. After Hoyt sold tract R in 1962, gravel was hauled away from the pile for some undetermined time either by Hoyt or the county. During the period 1952 or 1953 to 1957 the owner of tract S (Bishop) was aware of the gravel pile and hauling operations and knew his land was being used for that purpose. At one time he even noted someone had hung "No Trespassing” signs on the fence Hoyt had built around tract D. Bishop made no effort to interfere with the use of the property. He assumed the county was hauling the gravel, and he never saw any mining operation on Hoyt’s land. An aerial photograph in evidence shows clearly that in 1955 the area of the gravel pile and its access roads formed a large oval in tract D, the outlines of which paralleled and almost touched the westerly half of the northerly fence line and touched the easterly fence line almost at its midpoint. Although the record does not indicate why the fence was built where it is, the 250 foot northerly line runs to a point the shortest eastward distance from which a straight line could be run back to the Donation Land Claim line and still encompass the whole gravel pile.
There was substantial evidence that prior to March 8, 1957, when the state acquired tract S from Bishop, Hoyt had actually possessed tract D in a manner that was open, notorious, hostile, continuous and exclusive since he erected the fence in 1951 or 1952. See Grimstad v. Dordan, 256 Or 135, 471 P2d 778 (1970); Norgard v. Busher, 220 Or 297, 349 P2d 490, 80 ALR2d 1161 (1960). The question remains whether that adverse possession can be carried back to early 1947, the time the possession would have to have begun to have ripened into title by early 1957.
*[725] The only evidence relating to the pre-1951 period is that Hoyt may have at some time put up a fence along the Donation Land Claim line and shortly thereafter destroyed it, that a child was denied access to the property once between 1947 and 1951, that the gravel pile existed before the easterly fence was built and was begun in 1947 or 1948 and that children drove cars around the gravel pile in the early 1950s. There was no evidence either squarely showing or permitting an inference that Hoyt’s adverse possession began as early as March 9, 1947. Therefore, when Bishop conveyed to the state, he still had title to tract D.
We are therefore squarely faced with the question whether Hoyt’s adverse possession after March 8, 1957, can be asserted against the state, which by the conveyance succeeded to Bishop’s right to possession against Hoyt. It is clear that the nature of Hoyt’s possession did not change materially between 1957 and 1962.
ORS 12.250 provides:
"Unless otherwise made applicable thereto, the limitations prescribed in this chapter shall not apply to actions brought in the name of the state, or any county, or other public corporation therein, or for its benefits.”
Nothing in the language of ORS 12.050 (which establishes the 10-year limitation on real property actions) suggests that its terms are "otherwise made applicable” to this action by the state. Unless there is some legal principle or other statutory provision, those statutes prevent assertion of any claim that adverse possession could have ripened into title against the state after the 1957 conveyance.
ORS 368.620 expressly prohibits the acquisition by adverse possession against counties of "public roads.” We are asked to hold that this statute by implication recognizes a right to adverse possession against the sovereign in some circumstances. The history of that statute is well explained in Hislop v. County of Lincoln, 249 Or 259, 437 P2d 847 (1968), which *[726] demonstrates beyond any further argument the purpose and function of the statute. It has nothing to do with the general applicability of ORS 12.250.[5] Defendants suggest that there should be read into ORS 12.250 a distinction between the governmental and propriety functions of the state as a landowner, as some states have done. See Sisson v. Koelle, 10 Wash App 746, 520 P2d 1380 (1974); Ortiz v. Pacific States Properties, 96 Cal App 2d 34, 215 P2d 514 (1950). The statutes in those other states are not as strictly worded as is ours. The purported distinction has always been rejected in Oregon insofar as the statute of limitations is concerned. City of Pendleton v. Holman, 111 Or 532, 164 P2d 434, 162 ALR 249 (1945); see also Corvallis Sand & Gravel v. Land Board, 250 Or 319, 329, 439 P2d 575 (1968). It follows that the statute of limitations could not properly have been asserted against the state’s cause of action in ejectment.
The judgment of the trial court is reversed and remanded with instructions to enter judgment in favor of the plaintiff.

 The defendants are buying on a contract. At the time of the trial they had not taken a deed, but the parties did not treat that fact as significant in the circumstances, nor will we.

 The quitclaim deed from Downey and Richards to the Rosanbalms in 1977 is not asserted to be of especial significance in resolving this case. It was given after the initiation of this litigation and was not recorded.

 The order and decree did not make special findings on the elements of adverse possession. It does not appear that the parties requested findings, nor does the state assign as error any of the findings made or the failure to make findings. The case is nonetheless properly here for review. ORS 17.431(6).

The state has submitted- in an appendix to its brief a letter written by the trial judge to the parties after trial and before judgment, in which he said “evidence of the manner of such holding [by defendants’ predecessors] and its use is sketchy.” The letter is not part of the record in this case and cannot be considered.

 A similar and related statute, applicable to "cities and towns,” is ORS 221.750. The history and meaning of that statute is set out in Killam v. Multnomah County, 137 Or 562, 4 P2d 323 (1931).